[S. F. No. 3530.   Department One.—February 23, 1904.]

## S. C. OPPENHEIMER, Respondent, v. THOMAS J. CLU- NIE, Appellant.

142 313<br>f149 247

LEASE OF THEATER—ACTION TO CANCEL FOR FRAUD—FINDINGS AGAINST EVIDENCE—OBVIOUS DEFECTS—PRESUMPTION.—In an action to cancel a lease of a theater for alleged fraudulent representations that the premises were in good condition and repair, and safe and suitable for assembling large numbers of people, where the defects found relate to matters which were obvious, and could easily have been seen by plaintiff or his agent if they had used ordinary diligence, it must be presumed that he saw them when he took possession of the theater, and findings that he believed and relied upon the representations, and had no knowledge of the facts when he entered into the lease, are against the evidence.

ID.—RELIEF AGAINST FRAUD—ORDINARY RULE—DUTY TO INVESTIGATE.— While courts grant relief on the ground of fraud in clear cases, it is not the ordinary rule; but, in general, parties must rely upon their own judgment, and investigate before making contracts.

ID.—DELAY IN RESCISSION—AFFIRMATION OF CONTRACT—WAIVER OF RE- LIEF FOR FRAUD.—A party desiring to rescind a contract on the ground of fraudulent representations must do so promptly upon discovering the facts entitling him to rescind, if he is free from duress, menace, undue influence, or disability; and if after full knowledge of all the facts he continues to act under the contract, he thereby affirms it, and waives all benefit of relief for the misrepresentations.

ID.—ESTOPPEL OF PLAINTIFF.—Where the plaintiff affirmed and acted under the lease of the theater during the winter months, he will not be allowed to disaffirm it when the dull season begins; and where, after he notified the defendant of his intention to rescind, he again treated the lease as valid by offering a sum for a curtain privilege thereunder, and tried to sell the lease, he is estopped from seeking a cancellation thereof for fraud in its inception. He will not be allowed to blow hot and cold at the same time.

ID.—EVIDENCE—HEARSAY—REPORT OF GRAND JURY.—The report of the grand jury of the county relative to the unsafe condition of the theater was hearsay and not admissible in evidence for any purpose.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying. a new trial.   Thomas F. Graham, Judge.

The facts are stated in the opinion.

E. A. Bridgford, and Burrell G. White, for Appellant.

The facts stated and the evidence do not warrant a rescission of the contract, on grounds of which the defendant was chargeable with knowledge, it also appearing that he did not rescind promptly, but affirmed the contract. (Civ. Code, sec. 1691; *Nounnan* v. *Sutter County Land Co.*, 81 Cal. 1; *Colton* v. *Stanford*, 82 Cal. 351;[1] *Marten* v. *Burns W. Co.*, 99 Cal. 355; *Bailey* v. *Fox*, 78 Cal. 389; *Hammond* v. *Wallace*, 85 Cal. 522;[2] *Grymes* v. *Sanders*, 93 U. S. 55; *Cobb* v. *Hatfield*, 46 N. Y. 533; *Woods* v. *Carpenter*, 101 U. S. 141; *Southern Development Co.* v. *Silva*, 125 U. S. 250; *Hunt* v. *Turner*, 9 Tex. 385;[3] *Commissioners* v. *Younger*, 29 Cal. 177; 1 Story's Equity Jurisprudence, secs. 195, 200; *St. John* v. *Hendrickson*, 81 Ind. 350; Pomeroy's Equity Jurisprudence, secs. 892, 897, 965.)

H. I. Kowalsky, and Weil & Lippitt, for Respondent.

The rescission by the tenant was warranted by the fraudulent representations as to the condition of the leased premises. (Gear on Landlord and Tenant, sec. 81; Wood on Landlord and Tenant, sec. 122; 1 Woodfall on Landlord and Tenant, p. 218; Chaplin on Landlord and Tenant, sec. 114; *Davis* v. *McGrew*, 8 Pac. 618; *Wilson* v. *Dean*, 74 N. Y. 535; *Wilcox* v. *Hines*, 100 Tenn. 559.[4]) The presumption is, that the tenant relied on the statements of the landlord, who knew the condition of the premises when he executed the lease. (*Dow* v. *Swan*, 125 Cal. 681, 683; *Quarg* v. *Scher*, 136 Cal. 410; *Morris* v. *Courtney*, 120 Cal. 65.) Waiver depends upon actual and not upon constructive notice. (1 Am. & Eng. Ency. of Law, 2d ed., p. 1191; *First Nat. Bank* v. *Maxwell*, 123 Cal. 368.[5])

COOPER, C.—Plaintiff had judgment. Defendant made a motion for a new trial, which was denied, and this appeal is from the judgment and order.

On the thirty-first day of October, 1900, the defendant, by a written lease, let to the plaintiff the premises known as the Clunie Opera House in the city of Sacramento for the term

---

[1] 16 Am. St. Rep. 137.

[2] 20 Am. St. Rep. 239.

[3] 60 Am. Dec. 167.

[4] 66 Am. St. Rep. 770.

[5] 69 Am. St. Rep. 64.

of five years from and after the first day of December, 1900, at the rental of five hundred and fifty dollars per month, payable monthly in advance. Plaintiff entered into possession of the premises and paid the rent each month, as provided for in the lease, up to the latter part of April, 1901, at which time he claims to have rescinded the lease.

He commenced this action January 10, 1902, for the purpose of having the lease delivered up and canceled, to recover judgment for three thousand dollars and interest, being the amount deposited with defendant as security for the rent to become due, and for two thousand dollars claimed as damages.

It is alleged in the complaint that defendant falsely and fraudulently and with intent to deceive plaintiff represented that the premises "were in good condition and repair and safe and suitable for assembling large numbers of people"; and that plaintiff believed the said representations so made to him, and relied thereon, and had no knowledge of the facts at the time of entering into said lease.

It is further alleged that at the time the lease was executed the premises were unsafe and unfitted for the convening of any considerable number of people. The respects wherein the premises were unsafe are alleged as follows: "That the exits and stairways were at all times herein mentioned not sufficiently large or in the proper places, and these matters were adverted to in the report of the grand jury of the county of Sacramento of May 13, 1899."

It is earnestly claimed that the complaint does not state facts sufficient to show that plaintiff is entitled to the relief prayed for, or any relief, and that therefore defendant's demurrer should have been sustained. It certainly does not make a very strong case for the cancellation of the lease, but as the facts were all brought out in evidence, we have concluded to dispose of the case upon the merits without passing upon the demurrer.

The court found the facts as stated in the record, sustaining the allegations of the complaint.

It is claimed by defendant that the evidence does not sustain the findings, and that the plaintiff cannot maintain this action to rescind, because he did not rescind promptly, but

acquiesced in and ratified the lease after full knowledge of all the facts.

We are of opinion that defendant is correct on both propositions. Plaintiff was engaged in the business ·of conducting and managing theaters and opera-houses. He testified that at the time he took the lease, Todd, defendant's agent, told · him that "it was the intention of General Clunie to put in a cement basement down there, and told me that otherwise the house was in very good condition, and we negotiated the lease."

Plaintiff entered into possession of the premises on December 1, 1900. He was personally present and examined the theater on the third day of December.

The witness Todd, who was the agent of defendant, and whose testimony is not disputed, testified as to the examination made on this occasion by plaintiff as follows: "Q. It was within a day or two that he came up?—A. Yes sir.—Q. Did he make any examination of the theater?—A. I don't know that we particularly did.—Q. Tell what you did.—A. I cannot remember just now but I think we went over it; he wanted to see what he had leased, and we went through the house to that extent, and he said, 'This has got to be considerably overhauled,' both down and up stairs and had to be carpeted.—Q. What do you mean by overhauled?—A. Had to be cleaned up, he said it was very dirty—the former lessee had kept it very badly; of course we had shows right along following each other, night after night for weeks.—Q. Did you do anything about looking at the carpet?—A. Yes, he and I went down and picked out a carpet."

This witness further testified that before entering into the written lease, as part of the negotiations, he talked over with plaintiff as to improvements to be made, and at the time made a memorandum on an envelope of what was to be done, which memorandum witness took from his pocket while testifying, and said: "He [Oppenheimer] said the stage there was too small, and that the fly-gallery and the gridirons where the ropes go up to draw the machinery clear to the top of the flies—the fly-gallery is about 22 to 25 feet up—the gridiron is at the very top where you draw the scenery out of the way. I agreed then, after having consulted General Clunie about it, to raise this gridiron, and he did do it. . . . He [Oppen-

heimer] was to give General Clunie notice when he could put the carpenters there to do it; and he wanted General Clunie to do a whole lot of things."

This testimony is not denied by plaintiff, but corroborated by a letter to Todd, evidently written about the 1st of May, 1901, although not dated. In this letter plaintiff said: "Would ask General Clunie to wait a few days for May rent. There is no performance between May 29th and July 1st, when improvements can be made."

Plaintiff was present at the theater several times in December, 1900. In January, 1901, he deposited the three thousand dollars in lieu of a bond he was to give defendant as security. In February, 1901, he had telegraphic communication with his partner, Friedlander, in which he declined to have Friedlander as a partner in the business. He paid the rent monthly till May 1st, while all the time in the possession of the premises. The lease reserved to defendant the advertising-curtain privilege. On May 26th, after the claim of rescission, plaintiff wrote to defendant's agent, offering defendant five hundred dollars for the curtain privilege. Later he wrote offering one thousand dollars, which offer defendant accepted. Plaintiff testified that during all the time after he took possession of the premises one White was his agent and manager. He was then asked: "Q. Mr. White had full means of knowing the condition of the premises?—A. Mr. White was in Sacramento, I presume he knew it, I don't know."

The court found: "That the gallery and balcony of said premises were unsafe, and the exits were so placed as not to allow of the safe discharge of people in case of a panic, and that the stairways at the emergency exits of the lower floor were rotten." This finding is broader than the allegations of the complaint, but, disregarding this, the defects as found relate to matters which were seen or could easily have been seen by plaintiff or his agent if they had used ordinary diligence. The location of the exits, and the size thereof, were patent to any one. That a man engaged in the theater business would take possession of premises, overhaul them, have the galleries repaired in certain respects, and get new carpets for the entire theater, and keep possession for five months during the heavy business season, and not discover the loca-

tion and size of the exits from the gallery may be true, but it is difficult to believe it. A man of ordinary business intelligence and prudence would know these facts as soon as he viewed the premises. The exits and stairways were open to view, and we must presume that plaintiff saw them when he took possession of the theater. While courts grant relief on the ground of fraud in clear cases, it is not the ordinary rule. Generally parties must rely upon their own judgment and investigate before making contracts. To allow a party to lease premises, take possession of them, use them during the busy season, and pay rent under the lease, and then rescind the lease on the ground of fraud in its inception, would require a much clearer case than that presented by this record. If such rule were applied in this case, it would have to be applied in other cases of like character. It would be impossible for a landlord to know at what particular time or period a tenant might elect to rescind the lease. Such rule would make contracts rest on a very uncertain basis. It is much better that courts should not undertake to act as guardians of competent parties, but compel them to stand by the terms of their contracts.

It was said by the late Judge Temple (and approved by this court) in *Colton* v. *Stanford,* 82 Cal. 398:[1] "The power to cancel a contract is a most extraordinary power. It is one which should be exercised with great caution,—nay, I may say, with great reluctance,—unless in a clear case. A too free use of this power would render all business uncertain, and, as has been said, make the length of the chancellor's foot the measure of individual rights. The greatest liberty of making contracts is essential to the interests of the country. In general the parties must look out for themselves."

It is stated in *Southern Development Co.* v. *Silva,* 125 U. S. 250, that in order to justify a court of equity in setting aside a contract on the ground of fraudulent representations, the complainant must show by clear and decisive proof:—

"*First*—That the defendant has made a representation in regard to a material fact.

"*Secondly*—That such representation is false.

"*Thirdly*—That such representation was not actually believed by the defendant, on reasonable grounds, to be true.

---

[1] 16 Am. St. Rep. 137.

"*Fourthly*—That it was made with intent that it should be acted on.

"*Fifthly*—That it was acted on by complainant to his damage; and

"*Sixthly*—That in so acting on it, the complainant was ignorant of its falsity, and reasonably believed it to be true."

This court said in *Colton* v. *Stanford,* 82 Cal. 399: "A misrepresentation as the basis of rescission must be material; but it can be material only when it is of such a character that if it had not been made the contract would not have been entered into. The misrepresentation, it is true, need not be the sole cause of the contract, but it must be of such nature, weight, and force that the court can say 'without it the contract would not have been made.'"

If we apply the above rules to the facts of this case, we cannot say that without the representations plaintiff would not have made the contract of lease. There is no allegation as to the actual rental value, nor that the rental value was not, at the time the action was commenced, more than plaintiff was paying under the lease. The complaint does allege that the premises were unsafe and unfitted for convening any considerable number of people and unsuited for giving theatrical performances. If so, plaintiff is presumed to have known of such condition when he took possession of the premises and examined them. The rule is thus stated by Pomeroy in his work on Equity Jurisprudence (sec. 893): "If after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he

was misled." And again the same author says (sec. 894):
"If in a contract of sale or leasing, representations are made
by the vendor concerning some incidents, qualities, or attri-
butes of the subject-matter which are open and visible, so
that the falsity of the statement is patent to an ordinary ob-
server, and it is made to appear that the purchaser at, or
shortly before, the concluding of the contract, had seen the
thing itself which constitutes the subject-matter, then a
knowledge of the facts is chargeable upon such party; he is
assumed to have made the agreement knowingly, and can-
not allege that he was misled by the false representations."

It is a fundamental rule in courts of equity that a party
desiring to rescind must do so promptly. Our code provides
(Civ. Code, sec. 1691): "He must rescind promptly, upon
discovering the facts which entitle him to rescind, if he is
free from duress, menace, undue influence, or disability, and
is aware of his right to rescind." And the authorities are all
to the same effect. (*Bailey* v. *Fox*, 78 Cal. 396; *Barfield* v.
*Price*, 40 Cal. 535; *Gamble* v. *Tripp*, 99 Cal. 223; *Martin* v.
*Burns Wine Co.*, 99 Cal. 355; Pomeroy's Equity Jurispru-
dence, sec. 897.)

The learned author last cited says: "The person who has
been misled is required, as soon as he learns the truth, with
all reasonable diligence to disaffirm the contract, or abandon
the transaction, and give the other party an opportunity of
rescinding it, and of restoring both of them to their original
position. He is not allowed to go on and derive all possible
benefits from the transaction and then claim to be relieved
from his own obligation by a rescission or a refusal to perform
on his own part. If after discovering the untruth of the
representations, he conducts himself with reference to the
transaction as though it were still subsisting and binding, he
thereby waives all benefit of and relief from the misrepre-
sentations."

It is said in *Grymes* v. *Sanders*, 93 U. S. 55: "Where a
party desires a rescission on the ground of mistake or fraud,
he must, upon the discovery of the facts, at once announce
his purpose and adhere to it. If he is silent, and continues to
treat the property as his own, he will be held to have waived
the objection, and will be as conclusively bound by the con-
tract as if the mistake or fraud had not occurred."

So in *Commissioners* v. *Younger,* 29 Cal. 177, the court said: "A court of equity will not relieve a party from a contract on account of misrepresentation, when no confidential relation exists between the parties, and, where the means and sources of knowledge being equally accessible, and open to both, the party complaining has no right to place reliance upon the statement of the other; for the law aids the vigilant, not the idle, and will not undertake the care of persons who will not, with the means at hand, take care of themselves."

In this case the plaintiff knew, or had the means of knowing, the condition of the exits and stairways when he took possession of the property. At every performance given in the theater he must have known whether or not the exits were sufficient to allow the gallery to be emptied in proper time. He must have given many performances each month. If he did not by the use of his eyes, and the constant experience of using the property for the purposes for which it was leased, discover the alleged defects until the latter part of April, 1901, he cannot now call for the aid of the court in this form of action to relieve him from his gross negligence. He will not be allowed to affirm the contract during the winter months and disaffirm it when the dull season begins. He claims to have notified defendant the middle or latter part of April of his intention to rescind. He must have changed his mind, because we find him afterwards writing to ask defendant to wait a few days for the May rent, and in the latter part of May he offered one thousand dollars to defendant for the curtain privilege. He was then trying to sell the lease or make some disposition of it to one Barton. In his letter to Todd he said: "I have decided, in order to close this matter at once, to offer $1,000 for that curtain privilege. Kindly let me know, as I would like to phone to Barton to come up and also send a check for last month's rent and close the deal."

It is evident that in the latter part of May, when this letter was written, the plaintiff was not adhering to his attempted rescission. He was treating the lease as valid. If he could make money by keeping it as a valid lease, he evidently then intended to do so. If he could not, he desired to rescind. He will not be allowed to blow hot and cold at the same time. If plaintiff rescinded the lease in April, 1901, he afterwards waived any such attempted rescission by his conduct in say-

ing he intended to pay rent and agreeing to pay one. thousand dollars for the curtain privilege. The curtain privilege would have been no use to him if his lease was gone. If he had no lease in the latter part of May, it could not matter to him as to the right to curtain advertisements let by defendant to others.

The lower court seems to have placed considerable reliance upon a report of the grand jury of Sacramento County made in May, 1899, by which report attention was called to the unsafe condition of the theater. The report was hearsay, and was not admissible for any purpose. We know of no law, and none has been called to our attention, by which a grand jury has jurisdiction over private property. It was of no more force than if made by any other body of men in their private capacity.

If what has been said is correct, the judgment and order should be reversed.

Chipman, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed.
                    Shaw, J., Angellotti, J., Van Dyke, J.

, Hearing in Bank denied.