[L. A. No. 18125. In Bank. Mar. 2, 1943.]

DOUGLAS G. SHEARER et al., Respondents, v. CHARLES E. COOPER, Appellant.

Jerry Giesler, Gray, Cary, Ames & Driscoll, J. G. Driscoll, Jr., and John M. Cranston for Appellant.

Gang & Kopp, Martin Gang and Robert E. Kopp for Respondents.

SHENK, J.—The plaintiff, Douglas G. Shearer, with his wife, commenced an action against the defendant, Charles E. Cooper, to recover damages alleged to have been sustained by reason of false representations in the sale to the plaintiff of real property situated in San Diego County. The plaintiff had judgment for $19,650, interest and costs. The defendant appealed.

On the appeal it is not contended that the evidence is insufficient to support the trial court's findings that certain false representations were in fact made by the defendant to the plaintiff, and that if relied upon they were material inducements to the making of the contract. The only ground of the appeal is that the evidence is insufficient to support the finding of reliance on the false representations.

In 1932 the defendant, a breeder of race horses, purchased from the Huntington Land and Improvement Company 4,860 acres in the San Luis Rey Valley, San Diego County, which

he called the Rancho San Luis Rey. He did not need the entire acreage as a breeding establishment, and in 1934 listed 1,250 acres for sale. In 1933 the plaintiff, who was chief recording engineer for a motion picture studio in Culver City, had become interested in acquiring a ranch as a commercial venture and upon which to establish his home. David Backus, a real estate broker, showed him several places. He made his first visit to the Rancho San Luis Rey in May 1934. Negotiations between the plaintiff and the defendant commenced and continued for a period of twenty-two months. The parties came to an agreement and on March 10, 1936, consummated the purchase and sale for $61,500 of 550 acres situated generally along the easterly and southerly portions of the 1,250-acre tract. Four hundred and thirty acres on the easterly side were selected by the plaintiff because they included two large areas devoted to the raising of alfalfa, to which water was accessible through an irrigation system. The remaining 120 acres along the southerly side adjoining the 430 acres on the west were purchased because of some old adobe buildings at the westerly end thereof. The San Luis Rey River flowed diagonally through the 1,250-acre tract northwesterly of the 550 acres. The Keys Canyon Wash extends from the higher region on the east to the San Luis Rey River and is between the two alfalfa areas, which we shall designate as the north and south alfalfa fields.

Throughout the negotiations the defendant represented that there were 160 acres then in alfalfa, certain additional acreages available for alfalfa, for other cultivation, and for pasture, with certain areas in brush and trees. He submitted to the plaintiff a map, showing the various acreages in different colors, including 160 acres in alfalfa, 150 acres otherwise cultivable, and 145 acres of pasture and waste land all within the 550 acre tract. The defendant represented the cost of the irrigation system installation to have been $27,000. Other representations on his part were: That the San Luis Rey River was not heavy flowing, could not flood and had not flooded since the erection of the Henshaw Dam; that the stream in the Keys Canyon Wash was never more than a small creek, was not dangerous, could not possibly overflow or do any damage to the land, that he had "cured" any such possible tendency; that the property was readily accessible by automobile at all seasons from the north across the San Luis Rey River except for a few days in years of ex-

cessive rainfall when the wooden culverts were displaced but were easily dragged back into position by a team of horses or mules; that the property was accessible at all times across the Keys Canyon Wash.

The trial court found that the foregoing representations had been made, and that they were false in the following particulars: There were but 123 acres of alfalfa land, 15 acres of potential alfalfa land, and only 102 acres of land otherwise cultivable. The colored map incorrectly designated the areas, and incorrectly set forth the width, boundaries and course of the San Luis Rey River. The map used was a copy of one printed by the Huntington Land and Improvement Company. Before the exhibition of the colored map to the plaintiff, there had been removed therefrom the words "San Luis Rey River," the presence of which would have shown the river to be several hundred feet in width, instead of the narrow stream bordered by potential alfalfa acreage as depicted on the colored map. This map had otherwise been altered by the removal therefrom of the words "Steep Mountain" from the area east of the north alfalfa field, the larger portion of which had been colored on the map to designate it as cultivable land. The defendant had offered to the plaintiff the entire visible area planted to alfalfa, whereas the description of the property in the deed cut off about five acres of the south field.

The court also found and it is not questioned that the Keys Canyon Wash during any normal season of heavy rainfall was not a small creek but wide and fast flowing, and during such a season was a river which overflowed its banks; that the defendant knew the dangers from flood and that to his knowledge the waters from Keys Canyon had overflowed its banks and seriously damaged the south alfalfa field; that the San Luis Rey River also was and was known by the defendant to be a flood river which continued to be so after the construction of the Henshaw Dam; that the roads from the main highway over the San Luis Rey River and over the Keys Canyon Wash were impassable by any means of vehicular travel for long periods of time; and that the cost of the irrigation system was not $27,000, but less than $15,000.

The defendant contends that inasmuch as the plaintiff made numerous trips to the property he could see with his own eyes and must be deemed precluded by what he saw.

The plaintiff procured an aerial photograph of the area. He marked squares on a separate piece of tissue paper, and sent it with the photograph to the defendant with the request that he place it correctly on the photograph so that the plaintiff could see where the boundaries were. It does not appear that the defendant acceded to this request. Apparently neither the defendant nor the plaintiff knew the boundaries. The plaintiff made an attempt without success to locate a monument by which to establish them. After the purchase and in 1937 a survey was made at the plaintiff's instance, and the discrepancies were then disclosed. In the interim, and before the purchase, the plaintiff marked off squares on the aerial photograph which indicated that, if he had properly placed the eastern boundary, the western boundary line would cut off about five acres from the south alfalfa field.

The defendant showed to the plaintiff and explained the working principles of a planimeter, an instrument with which the plaintiff was not acquainted. Given the measurement of an area on a plane surface, a planimeter is used to measure multiples of the given area. Before the final agreement the plaintiff asked the defendant for the measurement of the race track on the defendant's property which showed on the upper edge of the aerial photograph. The plaintiff then used the instrument to measure the approximate acreage of the alfalfa fields, and "became suspicious" that the fields contained only about 128 acres. He communicated his suspicions to the defendant who sent back the message that there was something wrong, that the plaintiff's calculations were "cock-eyed," and that the alfalfa fields actually comprised 160 acres.

Upon the occasion of an earlier view of the property, the defendant had represented that some pine trees toward the southeast were within the boundaries of the offered property. Subsequently he discovered that he did not own that particular land. He thereupon acquired an additional 40-acre tract in order to include that area in the sale. He so informed the plaintiff.

After the purchase of the property the plaintiff proposed to the defendant that they replace the wooden culverts over the San Luis Rey River with a concrete bridge. This was done, the plaintiff furnishing the material and the defendant the labor. Before the first winter the plaintiff had some willows and brush cleaned out of the bed of the Keys Canyon

Wash. The plaintiff commenced the clearing of the cultivable land east of the north alfalfa field and sent for 3,000 orange trees for the purpose of planting them in that area. It was not until after the trees arrived that it became apparent that only about a third of the area was in fact cultivable. In order to plant all of the trees it was necessary to utilize about 35 acres of the north alfalfa field. The plaintiff also commenced the construction of improvements at the site of the old adobe houses. During the construction the road over the San Luis Rey River became so impassable that the plaintiff was required to assist the contractor across by means of a tractor. During the winter heavy floods destroyed the concrete bridge and a considerable portion of the south alfalfa field. Members of the plaintiff's family were stranded at the home site, which was so inaccessible for a long period of time that it became necessary to drop food and other articles to them from an airplane.

The defendant contends that the evidence conclusively shows that the plaintiff relied on his own investigations and not on the false representations. The defendant asks: ''May a prospective purchaser of real property who has actual affirmative knowledge that the seller has been mistaken in at least one material representation, thereafter rely upon any representations made to him by the seller or his agents? Is not the buyer thereby placed upon notice that all the other representations made to him may likewise be erroneous, so that he is no longer justified in relying upon any such representations?'' Here the defendant is referring to the representation that the property included the pine trees to the southeast and the plaintiff's discovery of the mistake by the defendant's voluntary admission and his purchase of additional land to make good the representation. Far from creating any suspicion in the mind of the plaintiff, it is more reasonable to suppose that the occurrence served to increase the plaintiff's confidence in a seller who thus proceeded to make good his representation. This same confidence and the subsequent reassurances by the defendant could also reasonably be found to have allayed any suspicion that the alfalfa fields contained less than 160 acres.

The defendant asserts that the substitution of a concrete bridge for the wooden culverts, and the cleaning of the canyon wash of willows and brush, could lead to but one

conclusion, namely, that the plaintiff did not rely upon the representations of the absence of flood conditions. But the trial court could justifiably conclude from the evidence that the plaintiff did so rely. The facts sufficiently indicated that the plaintiff's efforts were known to him to have been futile to stem, or prevent damage from, heavy floods, and that his object was merely to prevent the necessity of recovering and replacing the wooden culverts after a heavy rain, and to keep the normal current of the canyon wash in its proper place. ■ Likewise the conveyance of the contractor across the river by means of a tractor under flood conditions cannot be deemed to be evidence of assent to the conditions or previous knowledge thereof. The plaintiff was not required to vacate the property or abandon his partially constructed improvements when the true conditions became known.

■ Numerous visits to the property prior to purchase do not absolutely preclude reliance on representations made by the seller. We may assume that on those visits the topography of the land was plainly visible to the plaintiff; but it is not shown that he was so versed in the knowledge of land or soils as to be able to observe whether the areas were of the extent represented or whether they were susceptible to the cultivation represented.

■ After the purchase the plaintiff's accountants set up books for the ranch operations and placed the value of the irrigation system at $5,000. The placing of that figure on the value of the irrigation system does not necessarily signify that knowledge of its actual cost or value was possessed by the plaintiff before the purchase. The inference is reasonable that that value was fixed because of the discovery after the purchase that the actual cost and the subsequent allowable depreciation were considerably less than that represented by the defendant.

■ After the purchase both the plaintiff and the defendant treated the alfalfa crops from the entire area of both fields as the property of the plaintiff, and they were harvested as such until the defendant commenced the construction of a fence or laid out a line to mark a portion of the western boundary through the south alfalfa field. In response to an objection communicated to the defendant by David Buckus on behalf of the plaintiff that "if this line is run he [plaintiff] does not get part of one of the alfalfa fields that you sold him," the defendant stated: "Dave, I don't

know where the lines are. There is the contract, and the legal description; they had plenty of time to check it against the legal description. There is nothing I can do about it.'' The evidence was sufficient to justify the conclusion that the plaintiff did not know until after the purchase that all of the alfalfa fields were not included; and that a supposed reduction of about $5,000 in the asked price was not based on the elimination from the sale of a part of the alfalfa field.

It is fair to assume that the defendant did not know the exact location of the boundaries of the acreage which he sold to the plaintiff; but under the law it is a matter about which he should have informed himself before making the representations. The trial court concluded that the defendant's positive assertions in a manner not warranted by the information he possessed, of that which was not true even though he believed it to be true, constituted actual fraud within the meaning of subdivision 2 of section 1572 of the Civil Code.

The questions of the weight of the evidence and the credibility of the witnesses were for the trial court to determine. We cannot say that the conflict in this case is one of "mere words," as designated in *Herbert* v. *Lankershim,* 9 Cal.2d 409 [71 P.2d 220], at page 471, a case relied on by the defendant. Unlike the facts in that case, here there was in addition both documentary evidence and evidence of the conduct of the parties to support the finding and conclusion that the plaintiff was warranted in relying upon and actually did rely upon the defendant's false representations. The fact that there was also documentary evidence from which a contrary inference might have been drawn does not militate against the substantial nature of the conflict by which this court is bound in resolving intendments and inferences in favor of the action of the trial court.

Other authorities relied upon by the defendant do not warrant a different conclusion. He places special reliance on the case of *Carpenter* v. *Hamilton,* 18 Cal.App.2d 69 [62 P. 2d 1397], in support of his contention that the plaintiff, having discovered the falsity of one representation, was put on guard as to all other representations and could not legally rely upon any statement made by the defendant. The defendant again is referring to his voluntarily admitted mistake as to the location of the pine trees. The defendant cannot be heard to say that his voluntary admission of a mistake prior

to the purchase must be deemed to have put the plaintiff on guard as to the truth of other representations. The purpose of the rule invoked by the defendant is to close the door to false claims of reliance by the purchaser. But its application here in accordance with the defendant's contention would afford with impunity the opportunity for fraud on the part of the seller. ■ In *Carpenter* v. *Hamilton,* the judgment for the plaintiffs was reversed because the plaintiffs chose to inspect the property before purchase and by such inspection ascertained the true factual situation, or, without any conflict in the evidence, the true condition was so apparent as to foreclose their claim of reliance. (See also to similar effect *Oppenheimer* v. *Clunie,* 142 Cal. 313 [75 P. 899] ; *Maxon-Nowlin Co.* v. *Norswing,* 166 Cal. 509 [137 P. 240] ; *Elko Mfg. Co.* v. *Brinkmeyer,* 216 Cal. 658 [15 P.2d 751] ; *Gratz* v. *Schuler,* 25 Cal.App. 117 [142 P. 899] ; *Hackleman* v. *Lyman,* 50 Cal.App. 323 [195 P. 263].) That is not the situation disclosed by the record before us. Furthermore, it is not the law of this state that some examination made by the buyer will shield the seller from an action for damages. As was said in *Dow* v. *Swain,* 125 Cal. 674 [58 P. 271], "Every case must be judged for itself, and the circumstances which warrant or forbid relief cannot be scheduled. If the seller knows the facts [and to that should be added, or if he represents them as known to him], and the buyer is ignorant, and to the knowledge of the seller the buyer relies upon the representations," there is no reason why relief should not be granted, "although an imperfect examination was made. It may have been imperfect because of the representations." (See, also, *Neff* v. *Engler,* 205 Cal. 484 [271 P. 744].) As indicated in those cases the truth of the representations of the defendant in the present case could be checked accurately only by the employment of experts. In *Quarg* v. *Scher,* 136 Cal. 406 [69 P. 96], it was said that the purchaser had a right to rely on the representations as to acreage; that the acreage of land cannot be seen by the eye at a glance, but can only be ascertained with accuracy by scientific measurement. (See, also, *Morey* v. *Bovee,* 218 Cal. 780 [25 P.2d 2] ; *Eichelberger* v. *Mills Land & W. Co.,* 9 Cal.App. 628 [100 P. 117].) ■ An instrument for measuring the area of a plane by passing a tracer around the boundary line is not the scientific instrument by which the area of land is accurately measured. Scientific measurement of land is com-

monly made on the ground by surveying instruments. Moreover, any information revealed to the plaintiff by his use of a planimeter was not conclusive on the questions of reliance or duty to pursue the inquiry further, in view of the defendant's positive reassurances. (*Feckenscher* v. *Gamble,* 12 Cal.2d 482, 495 [85 P.2d 885]; *Shermaster* v. *California Home Bldg. Loan Co.,* 40 Cal.App. 661 [181 P. 409].)

It is our conclusion that there is substantial evidence in the record to support the finding that the plaintiff could and did rely upon the representations of the defendant found to have been false. No contention is made that the plaintiff did not sustain the amount of damages specified in the judgment.

The judgment is affirmed.

Gibson, C. J., Curtis, J., Edmonds, J., Traynor, J., and Peters, J., pro tem., concurred.