[Civ. No. 4448.   Fourth Dist.   Nov. 21, 1952.]

VICTOR A. LOBDELL et al., Respondents, v. WILLIAM
B. MILLER et al., Appellants.

James E. Pawson and Head, Jacobs & Corfman for Appellants.

Tobias & Bernard and E. J. Marks for Respondents.

GRIFFIN, J.—These actions, bearing superior court numbers 52621 and 52412 respectively, were consolidated for the purpose of trial and on appeal. For convenience, the Lobdells will be referred to as plaintiffs, and William B. Miller and Frank O'Farrell as defendants. On a motion to dismiss the appeal, these actions were before this court for consideration. (*Miller* v. *Lobdell,* 109 Cal.App.2d 628 [241 P.2d 30].) A brief statement of the issues and factual background is there related. On July 2, 1947, plaintiffs, who had been in the

restaurant business but never in the hotel business, purchased from defendant Miller a hotel, bathhouse, mineral springs, swimming pool, cabins and real property situated in Orange County. On July 21, 1949, Miller filed an action against the Lobdells to foreclose a chattel mortgage and trust deed given by them as security for the payment of a promissory note in the sum of $29,000. The Lobdells, on August 24, 1949, filed an action in the same court against Miller, his agent O'Farrell, and Orange County Title Company, to rescind the contract of sale and exchange, the note, trust deed, and chattel mortgage on the furnishings. This action was based upon alleged fraud, misrepresentation and concealment practiced by defendants prior to the exchange agreement. On February 5, 1951, judgment was rendered that Miller take nothing against the plaintiffs by reason of his complaint in the foreclosure action; the agreement of sale was rescinded; the note, trust deed and chattel mortgage were canceled, and the title company was ordered to reconvey the property. It was further decreed that the Lobdells recover judgment against Miller for $37,772.90, and that Miller, upon the payment of this sum, was entitled to have the personal property described in the chattel mortgage conveyed to him; that upon payment of said judgment and within 30 days thereafter, the Lobdells should convey to Miller the personal property described in the mortgage and the real property, he to become the owner thereof. Defendant Miller had owned property in Silverado Canyon, including the Shady Brook Hotel property here involved, for about 25 years. He subdivided various parcels and placed building restrictions on some of the subdivisions. The hotel property had been operated as a club and then as a hotel or health resort. The last lease was based upon a lease contract whereby Miller received a percentage of the income. Plaintiffs were interested by O'Farrell in the purchase of this property about May, 1947, who acted as exclusive agent for Miller. During these negotiations, which culminated in the sale of the property to plaintiffs, plaintiffs made various trips to inspect it, and each time were in the company of either one or both of the defendants. The sale price was $38,000, payable as follows: The conveyance to Miller of a duplex in the city of Long Beach at an agreed price of $10,000; $5,000 in cash, and the balance of $23,000 in installments evidenced by a promissory note in the sum of $23,000, which was secured by a deed of trust on the real property, and a chattel mortgage on the

furniture and furnishings. The transaction was completed in July, 1947. Plaintiffs took possession about August 1st. They closed the hotel and undertook extensive remodeling and refurnishing of the buildings. They remained in possession until after the trial of this action, which was commenced on July 18, 1950. They expended $26,605 in making repairs, remodeling, and in refurnishing the hotel property, the cabins and bathhouse (not counting plaintiffs' time expended). As the repairs and furnishings progressed, certain parts of the buildings were opened for occupancy in September of 1947, but the entire program was not completed so that the hotel property as a unit could be offered for occupancy until well into 1948.

The cost of remodeling and refurnishing exhausted the resources of plaintiffs so that on June 18, 1948, Miller loaned them $9,057 to help pay for the same. The original note was canceled, the securities released and a new note for $29,000 was executed, which was secured by a deed of trust on the property as improved by plaintiffs, and a chattel mortgage on the new furniture and furnishings.

The evidence shows that defendants made various representations to the plaintiffs during the negotiations for the sale, which representations were of facts which the trial court found were false and fraudulent and were made for the purpose of inducing the plaintiffs to enter into the transaction. These statements, as found, were:

"(a) That the business operations being conducted on the premises at the time of purchase, were, and for many months prior thereto had been, making an income of not less than seven hundred ($700.00) dollars per month.

"(b) That the hotel property being purchased was the only unrestricted property as a matter of record, and the only property permitted to be used for business purposes within a radius of approximately one mile with the one exception of a business already in operation known as 'Tommy's Cafe' immediately adjacent to the said hotel property.

"(c) That the swimming pool located on the hotel property had been and was then approved for public use by public authorities and was ready to be opened at any time; and that said swimming pool could be an immediate source of revenue and income; that such swimming pool facilities were in good order and working condition. . . .

"(d) That there existed a water spring, well and pumping plant on the premises being sold, with adequate and sufficient

water for all the needs of the hotel, bath house, swimming pool and premises being sold, and that said water supply was entirely independent from any other source whatsoever; that the water springs had so much water that the purchaser could divorce himself from the water company serving the general area; that the purchaser would have all the water he would ever need and never have to worry.''

The court then found ''that the plaintiffs . . . believed and relied wholly upon the false and fraudulent representations of the said defendants . . . and would not have entered into said contract had they not believed and relied'' thereon; ''that plaintiffs, on or about the 18th day of June of 1948, and prior to the discovery of the false and fraudulent representations as herein found, mutually agreed with the defendant . . . Miller to a refinancing of the debt . . . that . . . certain statements and representations were made by defendant . . . Miller, and certain facts were suppressed, and concealed by . . . Miller, to induce plaintiffs to enter into such refinancing agreement. . . . That defendant . . . Miller continued to conceal and suppress, and failed to state, the true facts as hereinbefore found regarding the business income and business restrictions upon the said premises and properties . . . that plaintiffs' records show actual operating losses from the date of possession in July, 1947, to and including June 30 ,1950, . . . That the plaintiffs had no knowledge of, or suspicion of, the falsity of said representations until the times herein found, and that plaintiffs could not, by the exercise of reasonable diligence, have discovered the falsity of said representations prior to the times herein found . . . that upon the suspicion of some, and the discoveries of other, false and fraudulent representations made by defendants to plaintiffs, as hereinbefore found, and during the month of April, 1949, plaintiffs informed defendant . . . Miller and . . . O'Farrell of such discoveries made, and their suspicions aroused. That thereafter and thereupon negotiations for the settlement of differences between plaintiffs and defendants were immediately initiated; that such negotiations for settlement as between plaintiffs and said defendants continued until on or about the 4th day of August, 1949, the date at which time plaintiffs gave Notice of Rescission . . . that . . . the plaintiffs believed that the controversies existing between the plaintiffs and defendants could be settled and adjusted without the necessity of legal action . . . that

said defendants refused to adjust or compromise. . . . It is not true that the plaintiffs, or either of them, have been guilty of laches and unreasonable delay in rescinding said agreement or in bringing this action." The court then found that the real and personal property described in the agreement of sale, "had a reasonable market value of twenty five thousand ($25,000) dollars, and no more."

Counsel for defendants have announced familiarity with the time-honored rule that on appeal, where there is sufficient substantial evidence supporting the findings of the trial court, an appellate court will not disturb such findings, and accordingly in their argument before this court they have admitted that there is sufficient evidence to show that defendants made statements to plaintiffs about the income of the hotel property being $700 per month, as found in paragraph (a), that Miller said he believed he had enough water in the spring to take care of the entire hotel property, and that the purchaser could divorce himself from the water company and rely upon the supply of water from the spring. The question of the sufficiency of the evidence to support the findings of the alleged making of false representations, as found, is not particularly questioned. The main questions are, as set forth in defendants' brief: Did the plaintiffs have actual or imputed knowledge of material misrepresentations and with such knowledge, act so as to ratify the transaction, estopping rescission? (2) Is the judgment based upon an erroneous application of the law as to reimbursement, and is it supported by the evidence?

We have read in excess of one thousand pages of reporter's transcript and have examined the many exhibits in the record. It conclusively shows as to finding (a) that defendant O'Farrell represented to plaintiffs, during the negotiations for purchase and at the time of sale, that the hotel was making and had made $700 per month. Some of the testimony indicated this was a net return and other testimony indicated that it was a gross return. The evidence clearly shows that in either case this fact was false as to the year 1947, and that the highest gross monthly return for that year was $411 and the lowest was $219; in 1946, the highest was $563 and the lowest was $389.50; in 1945, the highest was $790 and the lowest $489; and in 1944, the highest was $799 and the lowest $393.

It is defendants' position that even though the statements claimed to have been made may have been false, plaintiffs

discovered or should have discovered their falsity many months prior to the time when they claimed rescission based thereon; that under section 1691 of the Civil Code, rescission can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence; and that he must rescind promptly upon discovering the facts which entitle him to rescind. In support of the argument they cite such cases as *Ruhl* v. *Mott,* 120 Cal. 668, 677 [53 P. 304]; *Schneider* v. *Henley,* 61 Cal.App. 758, 763 [215 P. 1036]; and the dissenting opinion of Justice Schauer in *Williams* v. *Marshall,* 37 Cal.2d 445, 458 [235 P.2d 272].

Although there is some evidence which might have supported a contrary finding, there is sufficient evidence to show that prior to the transaction agreed upon, plaintiffs had no knowledge of the income of the property other than what defendants told them. There is evidence that when plaintiffs were looking over the property with the question of income in mind, defendant O'Farrell told them to stay away from the present lessee because he "was not cooperating." There was practically no income from the premises during the remodeling period. ██ It was not completed until approximately seven months after taking possession. At that time the rates were raised and the income did not amount to $700 per month. Counsel for defendants argue that this fact should have put plaintiffs on notice that the claimed representations made by defendants as to the income of the hotel were false. This fact would not necessarily operate as conclusive proof of the falsity of the statement. (*Sanders* v. *Park Beverly Corp.,* 109 Cal.App.2d 698 [241 P.2d 597, 600].) There is evidence that plaintiffs did not discover the actual income from the property until long after the refinancing program had been completed. In the spring of 1949, they found an old book in one of the rooms indicating what the monthly income had been from the hotel from June, 1945, to July, 1947. This record, which was the guest record of the former lessee during that period was then taken to an auditor. About the time of the trial the report was made showing the record of income as indicated. On May 3, 1949, defendant Milller was informed by letter from plaintiffs' attorney that unless an adjustment was made "possibly a rescision would be proper in connection with the entire deal."

While a contrary conclusion might reasonably be reached, the evidence sustains the finding of the trial court which in

effect recites that the representations as to the income from the hotel at the time of and prior to the sale here involved, were false and untrue; that such representations were known by defendants to be false at the time they were made, and that plaintiffs did act to rescind within a reasonable time after learning of the truth of such facts. (*Gould* v. *Escondido Valley Poultry Assn.*, 56 Cal.App.2d 681 [133 P.2d 448].)

■ Since there was one material misrepresentation justifiably relied on by the plaintiffs, it would ordinarily not be necessary to discuss other claimed misrepresentations. (*Hefferan* v. *Freebairn*, 34 Cal.2d 715, 721 [214 P.2d 386]; 12 Cal.Jur. p. 741, § 23.) Nevertheless, since defendants claim that the evidence shows such a material change in conditions, as to the property and management before and after the sale, we will consider the remaining claims.

■ As to finding (b) there is evidence that plaintiffs bought the hotel property with the representation that all the surrounding property, with but one exception, was restricted against other businesses in competition with the activities carried on by the hotel company; that in fact Miller sold certain lots near that property with the understanding that they were not so restricted; that massage work and a physiotherapy machine were being operated near the massage rooms and baths maintained by the plaintiffs. The question as to the time when plaintiffs obtained knowledge of the fact that certain lots were unrestricted, is problematical. Plaintiffs testified they first discovered it as to one lot at an early date, and that as to other lots, only a few months before trial. The finding of the trial court as to this paragraph is supported by the evidence.

■ As to finding (c), there is evidence that when plaintiffs were first shown the swimming pool it was full of water and had signs on it: "For Fire Only" and "No Swimming," However, several witnesses testified that defendants told plaintiffs that there was an existing permit for the operation of the swimming pool; that workmen were working on the water line, and that defendants had to do certain other things first, but that the pool would be open the next Sunday and for plaintiffs to bring their bathing suits and go swimming. It was not ready the next Sunday or thereafter. About July 6, 1948, after the purchase, plaintiffs testified they inquired at the county health department and were informed that no permit had been issued; that only a conditional one was

granted by letter dated in 1946, which required various structural changes in the pool (at an estimated cost in excess of $2,000) as well as the employment of a full time life guard. Plaintiffs had hoped partially to finance this expedition with a portion of the loan obtained from defendant Miller in June, 1948, but found it was not economical, and that subsequently they learned that sufficient water could not be obtained to supply the pool from the springs or from the water company, since the pool had to be emptied at least once each week to comply with the requirements of the health department. The evidence supports the court's finding as to this claimed misrepresentation.

As to finding (d), in regard to the water supply from the mineral springs, plaintiffs testified generally in accordance with the facts, as found by the court. The evidence is clear that there was a shortage of water from the mineral springs in the summer of 1948, and it was necessary to turn in water from the Shady Brook Water Company to obtain a sufficient supply for the hotel properties. It is apparent that plaintiffs did not regard this particular water shortage at that time as serious because of the use of water from the water company. There was also a shortage of water for a short time during September, 1947, at which time plaintiffs were using water from the water company and not from the mineral springs. In 1947, Lobdells blamed the shortage of water from the springs to leakage in the pipes, and accordingly purchased about 600 feet of new pipe before opening the baths. In June, 1948, more pipe "went wrong," and they connected temporarily with the water company lines. Plaintiffs talked with Miller about the trouble. Miller promised to furnish 300 feet of pipe to plaintiffs, but never produced. In August, 1948, plaintiff accosted defendant Miller while Miller was taking a treatment at the resort, and told him he was not obtaining sufficient water for the baths, etc. He told Miller: "You said there was lots of water here . . . I don't believe that you ever had any water up there," and Miller assured him that they "did have" and that there "shouldn't be anything wrong." He also complained about Tommy's Café operating on restricted property, and Miller said he could and would close it up immediately. Apparently this was not done. It appears that during the winter months there was no failure of the supply of water from the springs. During the summer months of 1950, there was not sufficient

water from the springs to supply the hotel property, and admittedly there was never, during the summer months, a sufficient supply of water for the purposes represented from any source. The evidence shows that these defendants were or should have been familiar with these facts. There was considerable evidence produced by the defendants which might well indicate that these plaintiffs made some partial independent investigation as to the water supply and as to some of the other claimed misrepresentations, and did in fact offer the premises for sale during this questioned period.

█ Defendants stress the fact that plaintiffs obtained concessions from defendant Miller in the fall of 1948, and obtained an agreement that they could pay their interest only, and that the principal payments would be waived until 1949, as bearing upon the claim that there was a waiver of the claimed fraud and ratification of the transaction, and that plaintiffs should now be estopped from rescinding. We will not set forth the conflicting evidence pertaining to this subject. *Buob* v. *Feenaughty Machinery Co.*, 191 Wash. 477, [71 P.2d 559] cited in *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744 [192 P.2d 935], holds that it would not be reasonable to suppose that a waiver resulted from an extension of time for payments on the buyer's notes. (See, also, 5 Williston on Contracts [Rev. ed. 1937] § 1524, p. 4268.) And in *Hefferan* v. *Freebairn*, 34 Cal.2d 715, 722 [214 P.2d 386], it is said that the making of two payments on a note after notice of rescission did not necessarily constitute a waiver. The ultimate finding of the trial court in this respect must be sustained.

█ Numerous visits to the property prior to purchase do not absolutely preclude reliance on false representations made by the seller. Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances a prudent man would not be put upon inquiry, the mere fact that means of knowledge are open to plaintiff and he has not availed himself of them does not debar him from relief when thereafter he shall make actual discovery. The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission. (*Denson* v. *Pressey*, 13 Cal.App.2d 472 [57 P.2d 522].) █ Where one conducts an investigation, he may still be entitled to rely upon certain representations concerning conditions as to which the investigation does not extend. (*Fuhrman* v. *American National B. & L. Assn.*, 126 Cal.App. 202, 213 [14

P.2d 601].) The evidence does not here conclusively show that the plaintiffs *completely* relied on their own investigation. ■ The questions of the weight of the evidence on the subject and the credibility of the witnesses were for the trial court to determine. (*Shearer* v. *Cooper,* 21 Cal.2d 695 [134 P.2d 764].)

■ The question of laches and unreasonable delay in rescinding was raised in *Williams* v. *Marshall,* 37 Cal.2d 445 [235 P.2d 372]. It is stated, page 455:

"The courts have frequently declared that there is no artificial rule as to the lapse of time which will justify the application of the doctrine of laches. Each case must be determined upon the basis of its facts, and in the absence of a palpable abuse of discretion the trial court's finding upon the issue will not be disturbed upon appeal." (See, also, *Blackman* v. *Howes,* 82 Cal.App.2d 275, 278 [185 P.2d 1019, 174 A.L.R. 1004]; *Bagdasarian* v. *Gragnon, supra,* p. 748; *Taber* v. *Bailey,* 22 Cal.App. 617, 623 [135 P. 975]; *Anderson* v. *Thacher,* 76 Cal.App.2d 50, 70 [172 P.2d 533]; *Mazuran* v. *Stefanich,* 95 Cal.App. 327, 334 [272 P. 772].)

■ Ratification of a fraudulent transaction can only occur when the person ratifying has full knowledge of the facts. (*McNulty* v. *Copp,* 91 Cal.App.2d 484 [205 P.2d 438]; *Holcomb* v. *Long Beach Inv. Co.,* 129 Cal.App. 285, 292 [19 P.2d 31]; *Mirich* v. *Underwriters at Lloyd's London,* 64 Cal. App.2d 522, 530 [149 P.2d 19].)

It is also argued in this connection by defendants that since plaintiffs must have had knowledge of some of the claimed false representations prior to rescission, and accordingly waived any right to rescission thereon, such fact would put plaintiffs on notice in regard to the other claimed false representations and it would be incumbent upon them to make full investigation promptly; that notice of facts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is in the eyes of the law equivalent to knowledge of all the facts a reasonable diligent inquiry would disclose, citing *Ruhl* v. *Mott,* 120 Cal. 668, 677, *supra.* A somewhat similar contention was made in *Shearer* v. *Cooper, supra.* There it was held that a purchaser of realty who has actual knowledge of the seller's misstatement in at least one material representation is not thereby precluded from relying on the other representations where the seller takes steps to rectify the error. It is not conclusively

shown in the instant case that the purchaser had actual knowledge of any misrepresentation made by the defendants prior to the transaction agreed upon. ▆ The mere fact that plaintiffs may have become suspicious that one or more of the many claimed representations were false would not necessarily preclude a recovery upon the other claimed false representations. (*Shearer* v. *Cooper, supra*; *Blackman* v. *Howes*, 82 Cal.App.2d 275, 280 [185 P.2d 1019, 174 A.L.R. 1004].)

▆ The fact that the purchasers inspected the premises before buying the property is not always conclusive that they did not rely upon the false representations of the seller. ▆ There are many exceptions to the general rule stated in *Carpenter* v. *Hamilton*, 18 Cal.App.2d 69, 75 [62 P.2d 1397], to the effect that in fraud cases, where the buyer is aware of suspicious circumstances or has learned of the falsity of one or more of the representations, he is under a legal duty to make a complete investigation, and may not rely on the statements of the seller. They are (1) That the buyer is not required to employ experts to investigate matters of a technical nature of which the seller has full knowledge and the buyer has none, and if for this reason the investigation is incomplete he may show that he relied on representations as to matters which he did not investigate. (2) That a buyer is not chargeable with knowledge of conditions which he fails to discover because of some artifice or deception of the seller. For other exceptions see *Palladine* v. *Imperial Valley Farm Lands Assn.*, 65 Cal.App. 727 [225 P. 291]; *Tatterson* v. *Kehrlein*, 88 Cal.App. 34 [263 P. 285]; *Sullivan* v. *Helbing*, 66 Cal.App. 478 [226 P. 803]; *Seeger* v. *Odell*, 18 Cal.2d 409 [115 P.2d 977, 136 A.L.R. 1291]; *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958]; *Ferguson* v. *Koch*, 204 Cal. 342 [268 P. 342, 58 A.L.R. 1176]; *Kalkruth* v. *Resort Properties, Ltd.*, 57 Cal.App.2d 146 [134 P.2d 513]; 12 Cal.Jur. p. 758, § 34, et seq.; and 6 Cal.Jur. 10-Yr. Supp. (1950 Rev.) p. 80, § 35a; and *Hefferan* v. *Freebairn*, 34 Cal.2d 715, 720 [214 P.2d 386].)

Considering plaintiffs' testimony, the discovery of the fraud, if any, was made months after the agreement had been signed and after the refinancing program was completed. The rule stated in *Gratz* v. *Schuler*, 25 Cal.App. 117 [142 P. 899]; and *Carpenter* v. *Hamilton, supra,* relied upon by defendants, is therefore not necessarily applicable. Discovery of the fraud

and deceit after the consummation of the transaction and after the party defrauded has been prejudiced, cannot defeat the right to recover. (*Rhea* v. *Surryhne,* 39 Cal. 579; 12 Cal.Jur. p. 761, § 35.)

The only question then arising is whether, after discovery, plaintiffs acted diligently in claiming a right to rescission. This question was thoroughly considered in *Williams* v. *Marshall, supra,* which also was before this court for consideration (223 P.2d 644), and the court there upheld the trial court's action in finding that a 15-month delay by purchasers in serving a notice of rescission was excusable and did not constitute an abuse of discretion entitling the sellers to a reversal where, among other things, the parties continued to negotiate from discovery of the falsity of the representations until service of the notice; that in the absence of an abuse of discretion the court's finding on the issue of laches will not be disturbed; that a vendee who has been defrauded by his vendor is entitled to a reasonable time to investigate the falsity of the representations, and the time so consumed cannot be charged as unreasonable delay.

It cannot here be said that there was an abuse of discretion by the trial court in finding that plaintiffs were not guilty of laches in serving notice of rescission and in finding that there was no unreasonable delay. In view of the conflict in evidence rule, the portion of the judgment entered upon the findings ordering a rescission must be affirmed.

A more serious question presents itself in reference to the second contention, i.e., that the damages allowed were not supported by the evidence or the law, and that a wrong measure of damages was applied.

The portion of the judgment awarding plaintiffs $37,772.90 was arrived at in the findings as follows:

Plaintiffs paid down to defendant Miller, cash..$ 5,000.00
Plaintiffs paid down to defendant Miller, by transfer of real property—agreed value..... 10,000.00
Plaintiffs' payments on indebtedness, both principal and interest ........................ 6,726.90
Plaintiffs' total operating losses from July of 1947, to June 30, 1950, including charges for depreciation and rental value of plaintiffs' personal occupancy ...................... 16,523.00
Plaintiffs' actual improvement expenditures, both real and personal property ................. 26,605.00
TOTAL .............................$64,854.90

From this, the court made deductions as follows:

Personal property acquired in transaction by
plaintiffs and sold ........................$   325.00
Parcel of real property acquired in transaction
by plaintiffs, sales price applied on indebted-
ness ...................................   2,000.00
Parcel of real property acquired in transaction
by plaintiffs and sold .....................    700.00
Amount of depreciation charged by plaintiffs for
real and personal properties ..............   8,000.00
Reasonable rental value during plaintiffs' occu-
pancy and use ...........................   7,000.00
Contribution by defendant Miller during re-
financing of June, 1948, toward purchase of
refurnishings and improvements ............   9,057.00
                                              ———————
                                             $27,082.00

RECAPITULATION

Plaintiffs' total debits ...........$64,854.90
Plaintiffs' total credits ........... 27,082.00
Leaving a balance due plaintiffs of $37,772.90

Defendants argue that the judgment gives to plaintiffs a rescission, and also by way of damages, everything they were "out of pocket"; that both rescission and damages are not authorized, nor is the "out of pocket loss," provided for in section 3343 of the Civil Code, a true measure of damages where rescission is also obtained; that rescission implies the restoration of the parties to the same situation in which they were *when the contract in question was made*; that the effect of the judgment in this case is to force defendants to purchase from plaintiffs several thousands of dollars worth of second-hand furniture, linens and other personal property for which they have no use or desire; that such ruling does not place defendants back in their original position; that all items expended by plaintiffs for personal property were expended after the transaction on July 2, 1949, and such purchases were no part of said transaction; that plaintiffs were strictly volunteers as to such purchases of personal property and defendants are not obligated to reimburse them for such amounts; and that the judgment should be reduced accordingly, citing *Solorza* v. *Park Water Co.*, 86 Cal.App.2d 653 [195 P.2d 523] ; *Hancock* v. *Williams*, 99 Cal.App.2d 80, 82 [221 P.2d 129] ; *Bank of America* v. *Greenbach*, 98 Cal.App.2d 220, 240 [219 P.2d 814] ; that plaintiffs may have been entitled to receive credit for monies they expended on permanent

improvements, taxes, etc., but were not entitled to be fully reimbursed for money spent purchasing personal property and making temporary improvements on the real property or expenses in caring for the property, citing *Newman* v. *Smith,* 77 Cal. 22, 27 [18 P. 791] ; that these items are included in the sum of $26,605 (less the $9,057 contribution) or $17,548, allowed as an item of recovery to plaintiffs; that the court should have used the true value of $9,500 instead of $10,000 "agreed value" of the real property, which property was accepted by defendants as part of the down payment for the hotel property; and that accordingly the judgment against defendants should have been reduced in the sum of $500. These are the major items about which defendants complain.

The remedy of rescission necessarily involves a repudiation of the contract. The remedy afforded by an action for the recovery of damages suffered by reason of fraud, under section 3343 of the Civil Code, involves an affirmance of the contract. The measure of damages recoverable in an action for rescission is essentially different from that in a simple action for damages caused by fraud. In the rescission action a plaintiff is entitled to recover the consideration he gave on restoration or offer of restoration of that which he received. He is also entitled to recover compensation for whatever consequential damages he may have suffered by reason of having entered into the contract. In the latter case, a plaintiff is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with additional damage arising from the particular transaction. (*Carter* v. *Carr,* 139 Cal.App. 15, 27 [33 P.2d 852].) This question was fully discussed in *Bank of America* v. *Greenbach, supra,* and it was there said, at page 240:

"Greenbach argues that section 3343 of the Civil Code controls the measure of damages in a rescission action. That section provides . . . The section concludes with this languauge: 'Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled.' Thus, the section is limited to actions for damages for fraud and deceit, and specifically excludes 'equitable' remedies, one of which is the remedy of rescission," citing *Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 763 [192 P.2d 935] ; and *Hefferan* v. *Freebairn,* 34 Cal.2d 715 [214 P.2d 386].

The record does not show that the trial court, in fixing the amount of recovery, used the measure of damages provided for in section 3343 of the Civil Code.

Where it is possible to bring about substantial justice by adjusting the equities between the parties, the fact that the status quo cannot be exactly reproduced will not preclude the plaintiffs from equitable relief. No matter what may be the complications or complexities, the powers of a court of equity are so broad as to adequately meet the exigencies of the case and render a decree which will justly determine the rights of the respective parties. (*Arthur* v. *Graham,* 64 Cal.App. 608, 612 [222 P. 371].) In *Kent* v. *Clark,* 20 Cal.2d 779, 785 [128 P.2d 868, 142 A.L.R. 576], the court held that under this rule a rescission might be ordered and a judgment rendered for the ''value of any improvements which the vendee has placed on the land.'' In *Stewart* v. *Crowley,* 213 Cal. 694, 701 [3 P.2d 562], it was said that ''in such actions the court may grant any monetary relief necessary to do complete equity between the parties.'' In *Shermaster* v. *California Home Building etc. Co.,* 40 Cal.App. 661, 667 [181 P. 409], a judgment for the value of improvements placed on the property, such as a well, pump, and small house, exclusive of any sum due defendant from plaintiff for use and occupation of the land and premises, was allowed. It was there held that the *cost* of the improvements was some evidence of their value.

In *Michaelian* v. *Elba Land Co.,* 76 Cal.App. 541, 554 [245 P. 476], the court allowed a recovery of the money paid on the purchase price and cost of improvements and deducted the rental value of the land while plaintiff was in possession. For other reimbursements ordered, see *Vice* v. *Thacker,* 30 Cal.2d 84 [180 P.2d 4] ; 4 Cal.Jur. p. 798, § 29, and cases cited.

The only question here to determine is whether the parties have been placed as nearly as possible *in status quo* and whether the amount allowed for a recovery was proper under the circumstances and was reasonable and equitable.

As to the item of $500, being the difference in agreed value of the real property deeded to defendants as part of the purchase price and the actual value thereof as contended by defendants, the court, under its equitable powers, had the right to fix the agreed value as the amount for which defendants should account. (*Swan* v. *Talbot,* 152 Cal. 142 [94 P. 238, 17 L.R.A.N.S. 1066] ; *Thompson* v. *Stoakes,* 46

Cal.App.2d 285, 293 [115 P.2d 830] ; *Lasher* v. *Faw,* 209 Cal. 726, 735 [289 P. 821].)

As to the item of $17,548, defendants complain because the findings fail to distinguish between the amount spent on improving the real property, which they admit might be properly charged, and the amount spent by plaintiffs for personal property purchased by them for which defendants claim plaintiffs are not entitled to be reimbursed because such purchases, particularly the furniture and furnishings, were voluntary on plaintiffs' part; that since title thereto was at all times vested in plaintiffs, defendants should not be forced to accept them and to reimburse plaintiffs for their cost price. There might be some merit to this last argument had it not been for the facts surrounding the furnishing of the furniture and fixtures and the sale of the old furniture, with the apparent acquiescence and approval of the Millers. The evidence shows that the old furnishings were quite dilapidated and that before much could be done with the property, attracting guests and securing an income therefrom, some improvements were necessary. The extent of those improvements which should have been made might be questioned. After the sale, Miller took a trip to Alaska and plaintiffs proceeded with the improvements. In May or June, 1948, plaintiffs went to defendants' home after his return, and disclosed their financial condition and told Miller that they owed considerable money on the furniture and other bills; that they wanted to pay it off and use the balance, which they figured would be around $2,000, in opening the swimming pool. Apparently Miller approved a plan to loan them $9,057 and took back a new trust deed and chattel mortgage on the new furniture and on· the real property, totaling $29,000. He then told them what the monthly payments would be. It appears that defendant Miller discussed with plaintiffs, prior to the sale, plaintiffs' intentions to completely remodel and refurnish the hotel. Defendants observed the remodeling and refurnishing being carried on and they knew of, or at least indicated that they ratified, the actions of plaintiffs in selling the old furniture and in purchasing the new furniture, by accepting a chattel mortgage on it, which mortgage listed the furnishings in detail. These expenditures were found by the trial court to be consequential damages suffered by reason of the fraud found to be committed by defendants. Although the evidence produced by plaintiffs on the subject is set forth more or less by lump sum and is not segregated to any particular extent as to detail,

the total sum found due is supported by the evidence. Defendants produced no definite evidence to contradict the figures suggested by plaintiffs. Although it cannot be said, as a matter of law, that the award is excessive, it does appear, to say the least, that plaintiffs do not stand to lose anything by the transaction; and that the evidence might well have justified a lower amount of damages than that found by the trial court. However, we find ourselves bound by the familiar rule, well known to the profession, that an appellate court possesses none of the functions of the trial court in passing upon the weight of the evidence, and cannot assume to exercise them. The question of the sufficiency of the evidence, as a matter of law, to support a verdict or finding may be presented to an appellate court for review, but its duty stops when it has determined that there is some substantial evidence to support it. It will not weigh the evidence, pass upon the credibility of witnesses, nor substitute its judgment thereon for that of the trial court, but will uphold the findings even though it would have decided otherwise if it had occupied the place of the trial judge. (2 Cal.Jur. p. 912, § 539.)

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied December 18, 1952, and appellants' petition for a hearing by the Supreme Court was denied January 19, 1953. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.