[Civ. No. 16545.   First Dist., Div. One.   Mar. 22, 1956.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), as Administrator With the Will Annexed, etc., Plaintiff and Respondent, v. A. VANNINI et al., Appellants; IRENE VAN DE CARR, Cross-Defendant and Respondent.

122

Howard C. Ellis, E. F. Delger and Bernard B. Glickfeld for Appellants.

Donahue, Richards, Rowell & Gallagher, A. R. Rowell and Joseph A. Wood, Jr., for Respondents.

PETERS, P. J.—Plaintiff brought this action against defendants for $40,000 balance alleged to be due on a contract to purchase certain mining properties. Defendants answered and cross-complained, negatively and affirmatively pleading fraud on the part of plaintiff. The trial court sustained a demurrer without leave to amend to the third amended answer and cross-complaint. Plaintiff moved for judgment on the pleadings. The motion was granted. Defendants appeal from the judgment thus secured.

The controversy involves the purchase and sale of an abandoned gold mine in Tuolumne County. The pleadings show the following: This mine was owned by the estate of Anna Bluett. In 1939 Ben F. Woolner was executor of that estate. On March 27, 1939, Woolner, as executor, acting under court authorization, entered into a written contract with defendant A. Vannini for the purchase and sale of the mine for $50,000

payable in accordance with the terms, covenants and conditions set forth in the agreement. One of these provisions was that Vannini agreed that within six months of the date of the agreement he would commence active preliminary work to unwater and clear the mine, and would perform a designated quantity of such work within the next eight months. In addition to this required work Vannini was given the election to run an exploration tunnel into the mine to further determine whether he wanted to go forward with active mining operations. If Vannini elected to do this exploration he was granted an additional three months for this purpose.

Within these periods, totaling a possible 17 months, Vannini was given the option to buy the mine by notifying the executor and by paying the first $5,000 on the purchase price, or within the enumerated periods he could elect not to proceed by executing a quitclaim deed back to the executor. If Vannini elected to proceed, he was required to make the $5,000 payment above referred to, and within five years thereafter the balance of the purchase price became due and payable.

The pleading, without stating when, then avers that sometime thereafter Vannini elected to operate and purchase the mine, but by agreement with the executor and with the approval of the court the time for the payment of the original $5,000 was extended to July 1, 1946. On that date Vannini paid the $5,000, which made the balance of $45,000 due on July 1, 1951. Sometime after Vannini exercised the option to buy the mine, the exact time not being pleaded, he assigned his interest in the project to Providence Tuolumne Gold Mines, Inc., the other defendant.

On July 1, 1951, the balance of the purchase price was not paid. On November 2, 1951, Woolner, as executor, entered into an agreement with the two defendants to the effect that, with the approval of the probate court, defendants could pay $5,000, and thereafter $5,000 annually, or could pay a 15 per cent royalty from the gross revenues, whichever was greater, until the full purchase price was paid. Under this extension agreement if any annual payment on the purchase price was not paid within 90 days of its due date, the executor was given the election to declare the entire balance due, or to cancel the agreement and retain all sums paid as liquidated damages. On December 3, 1951, the probate court approved the extension, and a $5,000 payment was made by defendant mining company.

Under this extension agreement the next payment of at least $5,000 was due on December 3, 1952. Neither defendant made this payment. The Bank of America, it having been substituted as executor of the estate, waited the 90 days, elected to treat the entire balance as due, and on March 9, 1953, brought this action for the $40,000 remaining due on the purchase price.

Defendants answered and cross-complained. By stipulation a demurrer to these pleadings was sustained and an Irene Van de Carr brought in as a cross-defendant. Thereafter, defendants filed their first and later their second amended answer and cross-complaint. Plaintiff demurred. So far as the record shows, no hearings were had or orders made in reference to these demurrers. Defendants then filed their third amended answer and cross-complaint, and plaintiff again demurred. These demurrers to both the answer and cross-complaint were sustained without leave to amend. The order so providing contains a reference to "Par. Five (5)," apparently referring to paragraph 5 of the demurrer which raised the statute of limitations. Thereafter, plaintiff moved for judgment on the pleadings. The motion was granted, judgment was entered accordingly, and defendants have appealed.

The question presented on this appeal is whether the third amended answer and cross-complaint alleges a valid defense and/or cause of action, good against a general demurrer. The answer and cross-complaint involved are predicated on the theory that defendants signed the agreements involved as a result of the fraud of Woolner, Irene Van de Carr and one John Chapman. In this connection paragraph II of the answer alleges, in part:

"On or before the 27th day of March, 1939, the defendants discussed with Woolner, Van de Carr and Chapman, the possibility of purchasing the mining property described in Exhibit 'A' which is attached to and made a part of the complaint herein. During the course of the aforesaid various conversations and discussions, Woolner, Van de Carr and Chapman, and each of them, asserted to defendants that the property described in Exhibit 'A' had been an active gold mine, from which large amounts of commercial gold ore had been extracted in years past; they further stated that the mining property described in Exhibit 'A,' prior to the date thereof, and the Agreement marked Exhibit 'B,' also attached to and made part of the complaint herein, had been shut down and unworked for many years. Woolner, Van de Carr and Chap-

man, and each of them further asserted that the mining operations on the aforesaid property had ceased, owing to differences between the former owners of the aforesaid property and their manager, while the mine located on aforesaid property was in the midst of active and profitable operation. Woolner, Van de Carr and Chapman, and each of them, further asserted that the property described in Exhibit 'A' contained extensive gold ore already blocked out. They further represented that said blocked out ore was commercial ore and that in order to prevent it from being removed after it had been determined to close the mine, the shaft and timbering therein was destroyed but that said commercial ore would be found intact when the mine was dewatered, cleared and retimbered. That said statements were false, that the falsity of these statements was known, or that the statements were not warranted by the information of Woolner, Van de Carr and Chapman, and each of them, even though they may have believed the statements to be true. That such representations of fact were made in an effort to bring about the sale of said properties and did bring about the sale of said properties, . . .

". . . immediately after the execution of the Agreement marked Exhibit 'A,' operations were commenced to rehabilitate the mining property described therein. It was first necessary to repair the road and bridge leading to the mine so that the heavy equipment which was necessary for mining operations could be brought in; an adit was then commenced which was to be driven nearly a mile into the side of the mountain in order to tap the old workings of the mine and to drain off the 11 million gallons of water which inundated the old mining operations. When 900 ft. of this tunnel had been completed, all work on the mine had to be shut down due to Order No. L 208 of the United States Government, which banned mining operations for the duration of World War II. At the close of World War II, with the lifting of Order L 208, work was again begun, but it was then found that most of the equipment had to be replaced and that some of the work which had been done immediately prior to the war had to be redone, for the reason that part of the tunnel had caved, necessitating the replacing of timbers. By January of 1948 the tunnel had progressed into the side of the mountain some 2,000 feet, but because the operation had led to a badly faulted area, the State Safety Mining Engi-

ner ordered the abandonment of this tunnel stating that it would be too dangerous to attempt to drain the 11 million gallons of water from the shaft through this means. A new tunnel was commenced and carried through to the old workings, through which the water was drained above said level, thereby making it possible to begin pumping the water which remained below that level. After all the water was removed, it then became necessary to extract approximately 50,000 tons of debris that clogged the old shaft and it was necessary to tram this debris a distance of nearly a mile. After the debris was removed, the old shaft was found to be badly caved necessitating its retimbering. In addition thereto, it was necessary, because of the request of the State Safety Mining Engineer, to replace the emergency raise in order to protect the workers who would be working in the old shaft. It was not until February 24, 1952, that the mine shaft was cleared and ready for actual mining operations. It was not until this time that it became possible for defendants to ascertain the falsity of the statements hereinbefore alleged to have been made by Woolner, Van de Carr and Chapman, and each of them, and to ascertain that there was no blocked out ore of commercial value or any value whatsoever, as had been represented by aforesaid parties, and each of them.''

The cross-complaint is based on substantially the same allegations, and prayed for the return of the $10,000 already paid on the purchase price, and for $387,000 expended by defendants in developing the mining property involved.

The rules applicable to such an appeal are well settled. ■ As against a general demurrer the pleadings must be liberally construed. (*Buxbom* v. *Smith,* 23 Cal.2d 535 [145 P.2d 305].) All of the allegations of the third amended answer and cross-complaint must, of course, be accepted as being true. ■ If the answer puts in issue a material allegation of the complaint, or sets up affirmative matter constituting a defense, the motion for judgment on the pleadings should not have been granted. (*MacIsaac* v. *Pozzo,* 26 Cal.2d 809 [161 P.2d 449] ; *Cass* v. *Rochester,* 174 Cal. 358 [163 P. 212].)

■ In addition to these well settled rules appellants erroneously contend that this court on this appeal is limited to considering the sole ground given by the trial court in sustaining the demurrers, and contend that, since the minute order sustaining the demurrers apparently refers to the statute of limitations, the sole question presented is whether the

statute of limitations bars their action and defense. This is not the law. "If the judgment . . . is right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusions." (*Campbell* v. *Bauer,* 104 Cal. App.2d 740, 743 [232 P.2d 590]; see also *Keenan* v. *Dean,* 134 Cal.App.2d 189 [285 P.2d 300]; *Evarts* v. *Jones,* 104 Cal. App.2d 109 [231 P.2d 74]; *Sears* v. *Rule,* 27 Cal.2d 131 [163 P.2d 443]; *Burke* v. *Maguire,* 154 Cal. 456 [98 P. 21].)

The quoted rule is important because, as stated in 1 Witkin, California Procedure, page 601, it is settled that the statute of limitations "runs only against a cause of action. If the answer pleads purely defensive matter, i.e., something which constitutes a defense to plaintiff's claim without calling for any affirmative relief, this defensive relief will not be barred by limitations. This is so even though the defensive matter could have been used as the basis of a cause of action for affirmative relief, and the statute has run on any such cause of action; it may still be used defensively. This principle is chiefly applied where the plaintiff sues on a contract, and the defendant denies any liability on the obligation on grounds of fraud. . . ."

In *Estate of Cover,* 188 Cal. 133, at page 140 [204 P. 583], this rule is stated as follows:

"In such a case, neither the limitation of the statute nor the doctrine of laches will operate to bar the defense of the invalidity of the agreement upon the ground of fraud, for so long as the plaintiff is permitted to come into court seeking to enforce the agreement, the defendant may allege and prove fraud as a defense. In short, it is not incumbent upon one who has thus been defrauded to go into court and ask relief, but he may abide his time, and when enforcement is sought against him excuse himself from performance by proof of the fraud." (See also *Sanders* v. *Sanders,* 117 Cal.App. 231 [3 P.2d 599].)

Although the statute of limitations is inapplicable to the defense of fraud, it will, of course, run against a cross-complaint seeking damages for such fraud by way of affirmative relief. (See *Jones* v. *Mortimer,* 28 Cal.2d 627 [170 P.2d 893]; *Sanders* v. *Sanders,* 117 Cal.App. 231 [3 P.2d 599]; *Strong* v. *Strong,* 22 Cal.2d 540 [140 P.2d 386]; *Hermosa Beach etc. Co.* v. *Law Credit Co.,* 175 Cal. 493 [166 P. 22]; *Bradbury* v. *Higginson,* 167 Cal. 553 [140 P. 254].)

The first question presented is whether the statute of limitations has run on the cross-complaint. The applicable statute of limitations is section 338, subdivision 4, of the Code of Civil Procedure providing a three-year statute for: ''An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.''

The quoted section, however, does not state all of the law on the subject. As stated in *Johnson* v. *Ehrgott*, 1 Cal.2d 136, 137 [34 P.2d 144]: ''The action for fraud and deceit must be commenced within three years after the discovery of the fraud, and if the plaintiff does not discover it when it is perpetrated, he must set forth the circumstances to excuse the late discovery. The court must determine from the allegations whether the delay was excusable or was caused by lack of diligence on the part of the plaintiffs.'' (See also *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958]; *Consolidated R. & P. Co.* v. *Scarborough*, 216 Cal. 698 [16 P.2d 268]; *Lady Washington Consol. Co.* v. *Wood*, 113 Cal. 482 [45 P. 809]; *Twining* v. *Thompson*, 68 Cal.App.2d 104 [156 P.2d 29].)

Here the pertinent dates are March 27, 1939, when the original option contract was entered into giving appellants 17 months to decide whether to purchase; July 1, 1946, when Vannini paid $5,000, and agreed to pay balance on July 1, 1951; November 2, 1951, the date of the agreement by respondents to accept $5,000, and this sum was paid on December 3, 1951; December 3, 1952, when the next installment became due and was not paid; March 9, 1953, when this suit was filed.

Respondent points out that three years from the date of the contract was March 27, 1942, and contends that no sufficient facts are alleged as an excuse for failing to discover the alleged fraud prior to that date. Respondent concedes that from October 8, 1942, until 1946 there was a government order prohibiting all mining operations, so that appellants could not have discovered the alleged fraud during that time, but points out that from 1946 to 1952 there was no prohibition, and contends no sufficient facts are alleged to excuse the failure to discover the alleged fraud during this period.

The facts alleged that are relied upon to excuse the delay are these: That extensive road repairs were necessary before work could be done in the mine; that it was necessary to

drive an adit or tunel nearly a mile into the mountain to reach the mining area; that there were 11 million gallons of water to be drained and 50,000 tons of debris to be removed before operations could begin; that the old shaft had to be retimbered, and, after the war had stopped development for four years, much of the work done before the war had to be done again.

We agree with respondent that, as a matter of law, these facts do not constitute a legal excuse for failing to discover the alleged fraud until 1952. The contract required the appellants to clear and dewater the mine within 17 months from March 27, 1939, the date of the original agreement. During these 17 months appellants were under no obligation to purchase. They were given that period of time to make their own investigation and to determine whether they desired to exercise their option to buy. Thus, the contract placed, upon appellants the duty of making their own investigation, within a period of 17 months, to determine whether they wanted to buy. In other words, the contract necessarily contemplated that appellants were to rely on their own investigations and not on representations made by respondent before they were obligated to pay one cent on the purchase price, and they were given 17 months to make this investigation. The fact that it became difficult for them to make these investigations, as long as it was not impossible to make them, is no legal excuse for failing to make them. Here, the only period of impossibility alleged is from 1942-1946, during the war. But from 1939 to nearly the end of 1942, and from 1947 to 1952 there is no impossibility alleged. The fact that respondent waived the time limits on the requirement of performing the exploration work did not excuse appellants from discovering the facts they should have discovered had they performed their part of the contract. ■ The rule is well settled that where "there is a duty to investigate, the plaintiff may be charged with knowledge of the facts which would have been disclosed by an investigation." (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 442 [159 P.2d 958]; see also *Johnson* v. *Ehrgott*, 1 Cal.2d 136 [34 P.2d 144].) That is this case.

■ Appellants attack this conclusion, contending that whether or not they exercised due diligence in discovering the fraud is a question of fact, citing *Neet* v. *Holmes*, 25 Cal.2d 447 [154 P.2d 854]; *Uchida Inv. Co.* v. *Inagaki*, 108 Cal. App.2d 647 [239 P.2d 644]; *Victor Oil Co.* v. *Drum*, 184 Cal.

226 [193 P. 243], and *Twining* v. *Thompson,* 68 Cal.App.2d 104 [156 P.2d 29].) Those cases undoubtedly so hold, but they are distinguishable from the instant case, because in all of them there was no allegation showing that the pleader was under a duty to investigate prior to the discovery of the fraud. In fact, in one of the cases, *Twining* v. *Thompson, supra,* at page 112, this distinction is expressly made. In the instant case there was a contractual duty to investigate, and this is pleaded. It must be held under the facts pleaded that appellants had a duty to clear the mine and investigate the project within 17 months of making the contract; that without legal justification they failed to do so; that they must, therefore, be charged with knowledge that they would have gained had they performed their contractual obligations.

Appellants also argue that the signing of the extension agreement implies a repetition of the fraudulent representations made in 1939. Actual repetition is not alleged. The only case authority cited by appellants on this point is *Kalkruth* v. *Resort Properties, Ltd.,* 57 Cal.App.2d 146 [134 P.2d 513], but in that case there was an express repetition of the misrepresentations. Here that is not alleged. Such repetition cannot be implied.

For these reasons it must be held that the third amended cross-complaint asking for affirmative relief shows on its face that it is barred by the statute of limitations.

This same defect in the pleadings of appellant also appears in the defensive matter pleaded in the answer. While the statute of limitations, as already pointed out, is not applicable to a defense predicated on fraud, even as to a defense based on fraud, the pleader is required to set forth all of the elements of fraud. What are these elements? In *Nathanson* v. *Murphy,* 132 Cal.App.2d 363, at page 367 [282 P.2d 174], this court summarized them as follows: "The elements required [of fraud] are succinctly set forth in *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 422 [159 P.2d 958] . . . 'In general, to establish a cause of action for fraud or deceit plaintiff must prove that a material representation was made; that it was false; that defendants knew it to be untrue or did not have sufficient knowledge to warrant a belief that it was true; that it was made with an intent to induce plaintiff to act in reliance thereon; that plaintiff reasonably believed it to be true; that it was relied on by plaintiff; and that plaintiff suffered damage thereby.' "

Here the materiality of the alleged representations sufficiently appears. Obviously, the representations as to the existence of a workable gold vein were of the very essence of the agreement. For the purposes of this appeal from a judgment on the pleadings we must assume that the representations were false and that Woolner, Van de Carr and Chapman either knew they were false or made them without sufficient information. It is equally true that damage is properly alleged. The real questions presented are whether it sufficiently appears that the false representations were made with the intent to induce appellants to act upon them, whether appellants had the legal right to rely upon them, and whether they did so rely. Appellants cite several cases holding that where the facts or pleading show that an investigation was made but such investigation did not disclose the falsity of the representations, either because the false representations and reliance thereon prevented a full inspection or because the defects unknown to the plaintiff were of a latent character, fraud can nevertheless exist. ▆▆▆ This is so because "Where one conducts an investigation, he may still be entitled to rely upon certain representations concerning conditions as to which the investigation does not extend" (*Lobdell* v. *Miller*, 114 Cal.App.2d 328, 338 [250 P.2d 357]) ; or, as was said in *Dow* v. *Swain*, 125 Cal. 674, 683 [58 P. 271], the examination "may have been imperfect because of the representations." (See also *Blackman* v. *Howes*, 82 Cal.App.2d 275 [185 P.2d 1019, 174 A.L.R. 1004] ; *Shearer* v. *Cooper*, 21 Cal.2d 695 [134 P.2d 764].) But the facts here pleaded do not bring that rule into operation. Here, under the facts pleaded, appellants agreed that, before they would determine whether to exercise their option, they would investigate the property, and they were granted 17 months to make the investigation. They were under a legal duty to make such investigation. In legal effect, this amounted to an agreement that appellants were not to rely on the representations made by respondent, but were to rely on their own investigation. But they made no real investigation before exercising the option. While it sufficiently appears from the pleading that in exercising the option the appellants relied on the false representations, the real question is not whether appellants relied on the false representations, but whether they had the legal right to rely upon them. It is in this respect that the pleading is defective.

What does the pleading disclose? That in 1939 appellants signed the option agreement. Obviously, when this agreement was signed, appellants had no way of knowing whether ore in commercial quantities existed in the mine. The respondent, as vendor, had superior knowledge of this fact. Under the allegations of the answer the respondent made the false representations as to the existence of ore in commercial quantities with intent to induce appellants to enter into the contract, and appellants had a right to rely on them. At this point, however, appellants had not been damaged because they had paid nothing for the option. They were supposed to make an investigation in the next 17 months. Clearly, the facts above stated, would have supported a cause of action for expenses incurred in that investigation. But, as already pointed out, the right to such affirmative relief is now barred. Then, on July 1, 1946, seven years later, appellants exercised the option to purchase. The real question is whether on that date appellants had the legal right to rely on the representations made in 1939. The option agreement makes it clear that appellants obligated themselves and they were under a contractual duty to clear out the water and debris and have it ready for mining operations within 17 months of the date of the option agreement. At the expiration of that time they had the power and right to exercise the option. Had they performed this obligation and duty they would have gained full knowledge of the falsity of the representations made to induce the contract. The very essence of their pleading is that when, in 1952, they completed the investigation which should have been completed in 1942, they discovered the falsity of the representations. Thus, their failure to acquire this information prior to 1952 can be attributable only to their failure to live up to the terms of the option agreement. Certainly, it cannot be successfully argued that when appellants exercised the option in 1946, respondent intended by the representations made in 1939 to induce appellants to exercise the option. Nor can it successfully be argued that in 1946 appellants, under the circumstances, had the legal right to rely on the 1939 representations. As a matter of law it must be held that the alleged misrepresentations were not intended, nor could not have been intended, by respondent to induce appellants to exercise their option. It must also be held, as a matter of law, that appellants had no legal right to rely on the false representations at the time that they exercised the option.

For the foregoing reasons, it must be held that the demurrer was properly sustained to the cross-complaint because of the running of the statute of limitations, and was properly sustained to the answer because it affirmatively appears that appellants had no legal right to rely on the alleged misrepresentations.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 20, 1956.