**Leon A. FLAX, Plaintiff,**

**v.**

**PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA, a New Jersey Corporation, Defendant.**

**No. 18088.**

United States District Court

S. D. California, Central Division.

Feb. 11, 1957.

Macbeth & Ford by Patrick H. Ford, Los Angeles, Cal., for plaintiff.

' Adams, Duque & Hazeltine, by James S. Cline, Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

By his complaint the plaintiff, Leon A. Flax, *now* a resident of California, seeks to recover the sum of $5,495.26 with 7% interest from February 19, 1955, which he alleges to be due to him from the defendant Prudential Insurance Company of America, a New Jersey corporation, as the surrender value of a policy of life insurance issued to him in the State of New York on February 10, 1916, *when* the plaintiff was a resident of New York. The original policy was for $1,864 payable on death and $463 pure endowment payable at the end of twenty years.

## I

### The Facts In The Case

The controversy turns on the meaning of an endorsement or "rider" attached to the policy on March 30, 1936. On that day, the complaint alleges, when the policy had a cash surrender value of $1,398.64, at the suggestion of the defendant, the plaintiff elected to convert the policy into a paid-up policy with new terms and conditions by exercising Option 2, which read:

> "It is expressly agreed that if the Insured by living at the end of twenty years from the date of this Policy, if all due premiums shall have been paid, and provided the Pure Endowment, specified on the first page hereof, shall not have been paid, and no premium shall have been waived or no instalment paid on account of disability, as herein provided, the Insured shall then have the right to select one of the following modes of settlement:

> \*   \*   \*   \*   \*

> "Or 2, Paid-Up Life Policy Of $1,478 for each $1,000 of the Amount of Insurance.

The Policy may be surrendered to the Company in exchange for a Paid-up Life Policy (participating) for the sum of One Thousand Four Hundred and Seventy Eight Dollars for each $1,000 of the Amount of Insurance under this Policy, pro-

vided that if this mode of settlement be selected evidence of the insurability of the Insured satisfactory to the Company be furnished, but no such evidence will be required if the Insured at any time within seventeen years from the date of this Policy shall notify the Company in writing of his intention to select this mode of settlement."

By reason of the election under this option a rider was executed and attached to the policy which reads as follows:

"Rider Form Attached to and Made a Part of Policy No. 2 115 498 On the life of Leon A. Flax Option 2 Of The Modes of Settlement End Of 20 Years Selected—Continuation Of This Policy. The Insured having selected Option 2 of the Modes of Settlement End of 20 Years, and having complied with the requirements as to evidence of insurability, it is agreed that, in lieu of being surrendered to the Company as required by the terms of said Option 2, this Policy is hereby continued in force, subject to its terms, as a Paid-up Life Policy for an amount of Twenty-seven Hundred and Fifty-five Dollars ($2755).

"Table of Cash Surrender And Loan Values For Each $1000 Of The Amount Insured, As Shown Above.

"(Values subject to reduction on account of any indebtedness as provided in the Policy.)

| "At The End Of | Cash Surrender And Loan Values | At The End Of | Cash Surrender And Loan Values |
|---|---|---|---|
| 21 Years | $1431.69 | 31 Years | $1761.11 |
| 22 " | 1463.02 | 32 " | 1795.02 |
| 23 " | 1494.81 | 33 " | 1828.85 |
| 24 " | 1527.10 | 34 " | 1862.57 |
| 25 " | 1559.74 | 35 " | 1896.10 |
| 26 " | 1592.75 | 36 " | 1929.33 |
| 27 " | 1626.06 | 37 " | 1962.19 |
| 28 " | 1659.58 | 38 " | 1994.65 |
| 29 " | 1693.31 | 39 " | 2026.58 |
| 30 " | 1727.16 | 40 " | 2057.93 |

"If this Policy is continued in force beyond the fortieth year, a table of Cash Surrender and Loan Values after the fortieth year will be furnished on application to the Home Office.

"Any indebtedness now or hereafter outstanding under the Policy will reduce the amount of insurance and the Cash Surrender and Loan Values as provided in the Policy.

"The Prudential Insurance Company Of America,

"By
"William W. Vanalts
"Secretary.

"Attest,
"Newark, N. J.    March 30, 1936."

According to the complaint, on February 18, 1955, within three months after the end of the 38th year, the plaintiff gave notice to the defendant of his election to apply for the cash surrender value of his policy. This surrender value is stated to be the sum of $5,495.26, being the cash surrender value of $1,994.65 multiplied by 2.755, set forth in the rider. As a condition of the payment to him of the amount, he has offered to surrender the policy to the defendant. Alleging the refusal to pay, the plaintiff seeks judgment in the amount already stated.

The Answer admits the execution of the main policy, exercise of the option by the plaintiff in 1936, and the demand and refusal to pay the amount demanded. Affirmatively the Answer alleges that the only sum due to the plaintiff as the cash surrender value of his policy

is $1,994.65. By way of counterclaim the defendant alleges that the rider attached to the policy *did not* express the real intention of the plaintiff and the defendant at the time of the exercise of the option, in that the amount *typed* in was the *total* surrender value of the policy and not its surrender value for each $1000.00 of the amount insured.

In substance, after quoting the lengthy clauses which need not be reproduced, the Answer and counterclaim also states these facts: The second paragraph of the rider instead of reading "Table Of Cash Surrender And Loan Values For Each $1,000 Of The Amount Insured, As Shown Above" should have read "Table of Cash Surrender And Loan Values For The Increased Amount Of Insurance."

The endorsement or rider was executed and attached in the belief that it embodied the agreement of the parties. In reality it was not in accordance with or provided for by virtue of Option 2 of the "Provisions as to Modes of Settlement End of 20 years" in that the cash surrender and loan values shown by the endorsement attached to the policy were in excess of the total value of the insurance provided for in the policy and the defendant would not have attached the endorsement had it known that the mistake existed or had it known that the policy of insurance as reduced to writing did not embody the real and actual agreement of the parties and did not fully and truly express their intention and meaning. The defendant had no knowledge of the existence of the mistake until during the month of June 1954, at which time, in the course of processing an application by the plaintiff for a loan on the policy, it discovered it. The defendant immediately notified the plaintiff of the mistake and requested him to join in the reformation of the policy to rectify it, which he has refused to do.

The Answer and counterclaim seek the reformation of the policy to conform with the intention just outlined.

In an amended reply to the counterclaim, the plaintiff denies that he exercised the option under a mistake as to his rights under the policy or that he knew or suspected at any time that the rider of March 30, 1936, did not express his or the company's true intention. The failure of the counterclaim to state a claim is pleaded and that, the claim, if at all, arose on March 30, 1936, and is, therefore, barred by the Statute of Limitations of California, New York and New Jersey.[1]

The policy contained the following incontestability clause:

"This Policy shall be incontestable after one year from its date, except for non-payment of premium."

The plaintiff's reply pleads this clause also as a bar to granting any relief to the defendant.

On a pretrial order entered on September 24, 1956, many of the facts relating to the execution of the original policy, the exercise of the option, the demand and refusal to pay the large surrender value asked by the plaintiff were admitted. The testimony at the trial relating to the issues before us will be discussed in greater detail further on in the opinion. For the moment we direct our attention to some important legal principles which govern the determination of this case.

## II

### Controlling Law

When the policy was executed, the option exercised and the rider in controversy attached, the plaintiff was a resident of the State of New York. The policy issued to him conformed to the requirements of the laws of the State of New York. This being a diversity case, the law of New York controls in interpreting the *contractual* rights of the

1. More specifically, the reply alleges that the Sections of the California Code of Civil Procedure which bar the actions are Sections 337, subd. 1, 338, subd. 4, 339, subd. 1, and 343. But, as will appear hereafter, the only Section applicable is Subdivision 4 of Section 338.

parties arising under the policy.[2] The plaintiff's trial memorandum concedes this.

■■■ New York courts have held uniformly that incontestability clauses of the type inserted in this policy *do not* prevent a contest of the policy on the ground of fraud or mistake. To the contrary, these courts make these defenses available to the insurer whenever an action is instituted to enforce any of the terms of the policy.[3] They take the view that when, either through mutual mistake or unilateral mistake by one party which is known to the other, the policy does not express the intention of the parties, reformation may be had either when an action is instituted by the insured to enforce its provisions or in a direct action brought by the insurer to make the policy speak verity.[4]

In one of the cases, an action was brought by the insurer to reform a disability policy so as to stipulate that the disability insurance to be paid to the insured was *$100 per month instead of $1,000 per month,* which had been inserted through a scrivener's mistake. The policy was issued in *1926* and the action was not begun by the insurer until *1937.* Notwithstanding this, the trial court granted reformation. The judgment was affirmed by the Appellate Division whose decision, in turn, was affirmed by New York's highest court, The Court of Appeals.[5]

In another case a policy, on its face, showed that $1,000 was payable on the death of the insured. However, on another page of the policy, under the table of "Guaranteed Loan Values and Surrender Options", there appeared a schedule of cash and loan values and a second schedule of paid-up life insurance. The paid-up life insurance value for the twentieth, twenty-fifth and thirtieth years was shown as $2,000. The paid-up value in the nineteenth year was only $930. The trial court found that the figures $2,000 were placed in the column of paid-up value by the person who typed the figures therein "in mistake for $1,000". It also found that the insurer had no way of discovering the error until the policy was presented with the demand for a $2,000 paid up policy, *twenty* years after the date of issue. Despite this and the fact that the court also found that the retention by the insured of the policy and his failure to call the attention of the company to the error until the twentieth year amounted to unethical conduct on his part, it refused relief on the ground that the action was barred within ten years *after the error was made.* The Appellate Division reversed the trial court and the Court of Appeals affirmed.

■■■ Because a similar contention is made in the case before us, the language of the Appellate Division in defending the right to reformation, after the unjustified claim is made, is particularly appropriate:

"In the present case the assured had exclusive possession of the policy. He knew, or should have known, that the paid-up value was intended to be $1,000, and not $2,000. He knew, or should have known, that the plaintiff was bound in law not to discriminate in insured's

2. 28 U.S.C.A. §§ 1332, 1652; Ostroff v. New York Life Ins. Co., 9 Cir., 1939, 104 F.2d 986; Standard Acc. Ins. Co. of Detroit, Mich. v. Winget, 9 Cir., 1952, 197 F.2d 97, 99; Ruhlin v. New York Life Ins. Co., 1938, 304 U.S. 202, 205 58 S.Ct. 860, 82 L.Ed. 1290.

3. Steinberg v. New York Life Ins. Co., 1933, 263 N.Y. 45, 188 N.E. 152, 153, 90 A.L.R. 642; Manhattan Life Ins. Co. v. Schwartz, 1937, 274 N.Y. 374, 9 N.E. 2d 16.

4. Equitable Life Assurance Society of United States v. Cannon, 1940, 259 App. Div. 808, 20 N.Y.S.2d 648, affirmed 284 N.Y. 640, 30 N.E.2d 492; Metropolitan Life Ins. Co. v. Oseas, 1942, 261 App.Div. 768, 27 N.Y.S.2d 65, affirmed 289 N.Y. 731, 46 N.E.2d 348.

5. Equitable Life Assurance Co. v. Cannon, supra, Note 4.

favor. Plaintiff did not know of the mistake, and could not have been expected to know that any such unconscionable claim would be made as that presented by the assured when he demanded a $2,000 paid-up policy. The failure to disclose the scrivener's mistake and presentation of that claim was such a fraud on assured's part as to call for application of broad equitable principles, and plaintiff's cause of action to reform did not accrue *until the date of the assured's demand.*

"Courts in other jurisdictions have permitted reformation of insurance policies where obvious mistake was established. In Hibbard v. North American Life Ins. Co., 192 Wis. 315, 212 N.W. 779, through error the cash surrender value was set forth as twice the correct amount. In Hemphill v. New York Life Ins. Co., 195 Ky. 783, 243 S.W. 1040, an excessive paid-up value was erroneously set forth in the policy. See also New York Life Ins. Co. v. Gilbert, 215 Mo.App. 201, 256 S.W. 148. This court recently, in Equitable Life Assurance Society of United States v. Cannon, 259 App. Div. 808, 20 N.Y.S.2d 648, affirmed 284 N.Y. 640, 30 N.E.2d 492, approved reformation of a policy so as to correct mistake made by insertion of a $1,000 monthly disability provision instead of $100 a month as applied for." [6] (Emphasis added.)

## III

### Limitation of Action

Notwithstanding this, the action having been brought in California, the counterclaim would still be barred if a California statute of limitations barred the assertion of the claim based on mistake. Although the plaintiff has pleaded several limitations, the only statute relating to the matter is Subdivision 4 of Section 338 of the California Code of Civil Procedure which bars an action for relief on the ground of mistake in three years. But that Section also provides:

" * * * The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." [7]

Admittedly, statutes of limitation may apply to claims asserted in answer by way of a set-off or counterclaim.[8] Affirmative relief based on mistake might be barred in three years from

---

**6.** Metropolitan Life Ins. Co. v. Oseas, 1942, 261 App.Div. 768, 27 N.Y.S.2d 69, 71. Richardson v. Travelers Ins. Co., 9 Cir., 1948, 171 F.2d 699, 7 A.L.R.2d 501, does not command a different conclusion. There, the federal court was interpreting a California policy, and, finding no California precedent, it held that the incontestability clause prevented reformation. The effect of this decision has been limited, if not entirely destroyed, by the decision of the Supreme Court of California in New York Life Ins. Co. v. Hollender, 1951, 38 Cal.2d 73, 237 P.2d 510, which must control us in interpreting California contractual law. See cases cited in Note 2.

While, as to remedies, the law of California is not binding on us, it is significant that under the mandate of Sections 3399 and 3400 of the California Civil Code, California Courts have decreed reformation for similar mistakes. See, Hosford v. Henry, 1951, 107 Cal.App.2d 765, 238 P.2d 91 (ommission of portion of property to be encumbered); Caviglia v. Jarvis, 1955, 135 Cal.App.2d 415, 287 P.2d 525 (failure to state manner of application of minimum annual payment of note).

**7.** California Code of Civil Procedure, § 338, subd. 4; see, Dabney v. Philleo, 1951, 38 Cal.2d 60, 65–66, 237 P.2d 648; Bennett v. Hibernia Bank, 1956, 47 Cal. 2d —, 305 P.2d 20.

**8.** Moore v. Gould, 1907, 151 Cal. 723, 732, 91 P. 616; Union Sugar Co. v. Hollister Estate Co., 1935, 3 Cal.2d 740, 745–746, 47 P.2d 273. But even this rule does not apply where the claims are compensated as cross claims. See, Jones v. Mortimer, 1946, 28 Cal.2d 627, 632–633, 170 P.2d 893; Sunrise Produce Co. of San Francisco, Inc., v. Malovich, 1950, 101 Cal. App.2d 520, 522–523, 225 P.2d 973. Nor does it apply to purely defensive matter. This may be pleaded, although barred by

discovery. The filing of the complaint interrupts the running of the statute. And under California law, where reformation is sought in a state court, on the ground of mistake, the pleading would have to set forth the reasons why no discovery was made sooner.[9] However, although this action is a diversity case, *the manner of asserting mistake* or any other ground for equitable relief is governed by our federal law. The only requirement as to pleading mistake is that

"the circumstances constituting * * * mistake shall be stated with particularity." [10]

And it is a cardinal rule of federal equity jurisprudence that where it is sought to enforce a provision in a contract which was the result of remediable mistake, the mistake need not be asserted until action is sought on the instrument in which the mistake occurred. This, because the right to reform an instrument is co-existent with the contract. So long as the contract is enforceable, the party against whom it is sought to enforce has the right to plead mistake and seek an interpretation of the instrument which would eliminate the clause inserted by mistake. This upon the ground that reformation is merely incidental to the ultimate relief sought.[11] And under our liberal federal rules of procedure facts may be found as they are disclosed at the trial and findings be made upon the facts as they appear, regardless of any defect in pleading them.[12] So we come to these important considerations: (a) Was there a mistake in the execution of the rider which was attached to the policy when the insured on March 20, 1936, exercised one of the options under the policy converting it into paid-up insurance? (b) Was the mistake of a type for which

relief can be granted in an action of this character?

## IV
### Reformation For Mistake

Answers to these questions require a brief consideration of the circumstances under which, generally, equity will grant relief for mistakes. From time immemorial, it has been the function of equity as administered in the federal courts to remedy what is known as "scrivener's mistakes"—mistakes performed by the person who drafted the instrument in such a manner that it did not express what was *actually* agreed. In an early case, the Supreme Court of the United States stated the principle and the reasons for it in this manner:

"There are certain principles of equity, applicable to this question, which, as general principles, we hold to be incontrovertible. The first is, that where an instrument is drawn and executed, which professes or is intended to carry into execution an agreement, whether in writing or by parol, previously entered into, but which, *by mistake of the draftsman, either as to fact or law, does not fulfil, or which violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce conformity of the instrument to the agreement.* The reason is obvious: the execution of agreements, fairly and legally entered into, is one of the peculiar branches of equity jurisdiction; and if the instrument which is intended to execute the agreement be, from any cause, insufficient for that purpose, *the agreement remains as much unexecuted, as if one of the parties had*

limitation. Bank of America National Trust & Savings Ass'n v. Vannini, 1956, 140 Cal.App.2d 120, 127, 295 P.2d 102.

9. Bradbury v. Higginson, 1914, 167 Cal. 553, 557–558, 140 P. 254; Sidebotham v. Robison, 9 Cir., 1954, 216 F.2d 816.

10. Rule 9(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

11. Restatement, Contracts, § 507.

12. Rule 15(b), Federal Rules of Civil Procedure.

*refused, altogether, to comply with his engagement;* and a court of equity will, in the exercise of its acknowledged jurisdiction, afford relief in the one case, as well as in the other, *by compelling the delinquent party fully to perform his agreement, according to the terms of it, and to the manifest intention of the parties.* So, if the mistake exists, not in the instrument, which is intended to give effect to the agreement, but in the agreement itself, and is clearly proved to have been the result of ignorance of some material fact, a court of equity will, in general, grant relief, according to the nature of the particular case in which it is sought." [13] (Emphasis added.)

The principle has been followed in later cases and it is now an accepted norm of equity jurisprudence as administered in the federal courts that reformation will be granted for mistake.[14] Even unilateral mistake may be the basis for relief when it is known to the other party to the contract.[15] In this respect, modern cases make no distinction between reformation and resti-

tution (or recission). Mistake of this character being found, the relief will be granted in whatever form it may seem most equitable to the court.[16] Indeed, when the facts appear which justify the reformation of a writing, a court may

"in its discretion without a preliminary decree of reformation give effect to the transaction as if it had been reformed." [17]

When this is done,

"there is substitution of the intended contract for a contract that the parties expressed in the writing." [18]

The attitude of the courts is not only equitable but also sound in its practicality. The case before us presents a perfect situation for the application of these principles.

## V

### There Was Evident Mistake

On January 11, 1916, in Brooklyn, New York, plaintiff executed an application for the issuance of a 20-payment life policy of insurance upon his life in the amounts already stated. The application was accepted on February 10, 1916. It has been in the plaintiff's pos-

---

13. Hunt v. Rhodes, 1826, 1 Pet. 1, 13, 7 L.Ed. 27. See, 76 C.J.S., Reformation of Instruments, § 25(e) ; 45 Am.Jur., Reformation of Instruments, § 54.

14. 12 Am.Jur., Contracts, § 138; 45 Am. Jur., Reformation of Instruments, § 54; 76 C.J.S., Reformation of Instruments, § 25; Walden v. Skinner, 1879, 101 U.S. 577, 25 L.Ed. 963; Simmons Creek Coal Co. v. Doran, 1892, 142 U.S. 417, 435, 12 S.Ct. 239, 35 L.Ed. 1063; Hawkins v. Fradkin, 1949, 85 U.S.App.D.C. 310, 178 F.2d 705, 708; Prudential Ins. Co., of America v. Strickland, 6 Cir., 1951, 187 F.2d 67, 70.

In Simmons Creek Coal Co. v. Doran, supra [142 U.S. 417, 435, 12 S.Ct. 245] the principle is summed in this manner:

"The jurisdiction of equity to reform written instruments, where *there is a mutual mistake, or mistake on one side and fraud or inequitable conduct on the other, is undoubted.*" (Emphasis added.)

15. Williston on Contracts, Rev.Ed., 1937, Vol. 5, § 1573; Restatement, Restitution,

§ 12(c); United States v. Jones, 9 Cir., 1949, 176 F.2d 278, 285–286; 12 Am. Jur., Contracts, § 133. See, Simmons Creek Coal Co. v. Doran, supra, Note 14. This principle is embodied in California law: Section 3399 of the California Civil Code provides that the contract may be revised either for mutual mistake or mistake of one party, which "the other [party] at the time knew or suspected"; Section 3400 of the Civil Code provides that for the purpose of revising a contract, "it must be presumed that all the parties thereto intended to make an equitable and conscientious agreement".

16. 17 C.J.S., Contracts, § 146 ; 45 Am.Jur. Reformation of Instruments, §§ 89–92.

17. Restatement, Contracts, § 507; Williston on Contracts, Rev.Ed., 1937, § 1599.

18. Restatement, Contracts, § 507, Comment (a) p. 976; Presson v. Commonwealth Mut. F. Ins. Co., 1951, 366 Pa. 436, 77 A.2d 353, 355. And see, New York Life Ins. Co. v. Hollender, 1951, supra, Note 6.

session since, except for the instances where it was sent to the Company for the purpose of changing beneficiaries and attaching the rider under consideration.

On March 11, 1936, pursuant to the "Provisions as to Modes of Settlement End of 20 Years", plaintiff selected Option 2 which has already been fully set forth. In attaching the rider the wrong form was used. The typed portions of the rider correctly stated the full surrender value of the policy *after* a certain number of years. But the printed form was one which contained the phrase "Table of Cash Surrender and Loan Values for Each $1,000 of the Amount Insured, as Shown Above".

The evidence in the record shows that another form should have been used which eliminated computation on the basis of $1,000, but stated, as the typed portion of the policy did, the *full* surrender value of the policy. Following the exercise of this option, the plaintiff paid no additional premiums on the policy. The Company retained the amounts paid by the insured in consideration of which it continued to insure him for the remainder of his life. The plaintiff borrowed money on the policy before and following the conversion. The main policy stated that the loan and surrender values were identical. (Table of Loan and Nonforfeiture Values, p. 3., Column (1)) The correspondence with the plaintiff from the time of conversion and for many years thereafter showed clearly that he knew that the loan value of the policy was identical with its surrender value.

On several occasions, in conjunction with loans, his attention was called to the fact that *his loan on the policy either approached or exceeded its surrender value* and adjustment was required of him. The plaintiff was, at all times, a successful business man, engaged in various business activities of an executive nature. It is inconceivable that he should have thought that a policy which (omitting the small endowment feature),

on his death, paid $1864 or $2755, could, *at any time,* acquire a surrender value of $5495.26, such as he claimed at the end of 38 years, and seeks now to recover.

No duplicate of any policies or riders is kept by the Insurance Company, only records showing the outstanding policies and their nature and books of entry noting action on them during their existence. At no time when correspondence was had relating to the amount of a loan did the plaintiff demur to the contention of the company that the loan was either *approaching* or *exceeding* the surrender value. Not until he complained to the California State Insurance Commissioner, who sent to the defendant a letter, dated June 22, 1954, did the Company learn that the plaintiff claimed that the typed surrender value *did not* refer to the *entire* cash surrender value of the policy, but applied to *each* thousand dollars of the amount insured. As already appears, the plaintiff did not demand the sum of $5,495.26, his claimed surrender value of the policy computed by multiplication of $1,994.64 by 2.755, until February 18, 1955.

Assuming that in order to toll the statute, it is necessary to show discovery within three years before action is brought and the facts which prevented discovery before (see Part II), I am convinced that the defendant has met the burden.

## VI

### Summary and Conclusion

█ The case before us is an almost ideal illustration of the classical instance referred to in the books, that of a person looking at cheap jewelry and seeing what he, at once, recognizes as being a valuable jewel, which, by mistake, had been placed with the "paste", purchases it at a price wholly unrelated to its real value. In the circumstances, as the Restatement puts it:

"The shopkeeper is entitled to restitution because the shopkeeper did not, as A knew, *intend to bargain*

*except with reference to cheap jewelry.*" [19]

The plaintiff is an experienced businessman and should have known that in modern business and insurance practice, a clause which would make the surrender value of a policy more than double its maturity value, without additional obligations on his part, was not within its contemplation. His coverage at the inception of the policy (omitting the endowment) was $1,864, which was increased on conversion to $2,755.

At no time prior to 1954, in his borrowings on the policy, did he seek more than its surrender value or *demur when his loan was limited to that amount.* The defendant had no knowledge of the unjustified claim of the plaintiff until 1954. Except when the rider was attached, the policy was in its possession a few times only for the limited purpose of changing the beneficiary. These matters went to a special department, the function of which *was not to review* the contents of the policy or of the riders attached. So it is quite evident that the scrivener's mistake in using the wrong form and in failing to delete from its printed part the sentence "for Each $1,000 of the Amount Insured, as Shown Above" *was not* and *could not* have been discovered before June, 1954, and that there was no negligence in failing to do so.

▮▮▮▮▮ This date is within the three-year period which applies to affirmative relief sought for mistake.[20] To summarize: The plaintiff either did or did not know of the mistake. *If he did,* it appearing that the mistake *was not known* to the insurer, we have the type of unilateral mistake for which relief by way of reformation is granted. *If he did not* know the mistake, we have a case of mutual mistake for which reformation also lies. Indeed, relief may be granted by disregarding the printed words which the scrivener erroneously failed to delete.[21] This can also be done by applying the well-known rule of construction which teaches that if there is a conflict or apparent inconsistency between the written and printed portions of a contract or a reasonable doubt exists as to the sense and meaning of the whole, because of the presence of incongruous printed words, the written words will control the courts in interpreting the contract.[22]

As stated by the Supreme Court in a leading case:

"It is a well-settled rule of law, that, if there is a repugnancy between the printed and the written provisions of the contract, the writing will prevail. It is presumed to express the specific intention of the parties." [23]

Entering into business undertakings, parties *do not intend* to over-reach each other, but rather mean to make equitable and conscionable agreements.[24]

One of California's Court of Appeals has summed up the principle in these words:

"In every contract there is an implied covenant of good faith and fair dealing." [25]

And the courts of New York have stated repeatedly that a contract, even a contract of insurance

19. Restatement, Restitution, § 12, Ill. 8.

20. See cases cited in Notes 7, 8 and 9.

21. See cases cited in Notes 16, 17 and 18. And see, Wigmore on Evidence, 3rd Ed., 1940, Vol. 9, § 2416.

22. 12 Am.Jur., Contracts, § 253.

23. Thomas v. Taggart, 1908, 209 U.S. 385, 389, 28 S.Ct. 519, 520, 52 L.Ed. 845. See, New York Life Ins. Co. v. Hiatt, 9 Cir., 1944, 140 F.2d 752, 753, 163 A.L.R. 551; Broderick Wood Products Co. v. United States, 10 Cir., 1952, 195 F.2d 433, 438; Burdines, Inc., v. Pan-Atlantic Steamship Corp., 5 Cir., 1952, 199 F.2d 571, 573; Restatement, Contracts, § 236(e).

24. 17 C.J.S., Contracts, § 318, p. 738 (good faith), § 319. This principle is embodied in the California Civil Code which declares it a presumption when the courts are called upon to revise a contract. California Civil Code, § 3400.

25. Matzen v. Horwitz, 1951, 102 Cal.App. 2d 884, 892, 228 P.2d 841, 845.

"should not be construed so as to place one party wholly at the mercy of the other." [26]

California courts recognize these principles. They follow a rule of interpretation

"which favors a construction of a contract as bilateral, affording protection to both parties, rather than unilateral." [27]

■ This for the reason that the written or typed portion of a contract expresses the *conscious choice* of the parties. In dealing with a demand that seems unconscionable, the courts apply the normal presumption that

"a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." [28]

■ It is quite evident that not until the middle of 1954 did the plaintiff assert the claim made in this action. His prior conduct conformed to an interpretation of the agreement which *limited* the surrender value to the typed portions of the rider and disregarded the words which the scrivener had erroneously forgotten to delete from the *wrong form* which he used,—namely, "for Each $1,000 of the Amount Insured, as Shown Above". There is no credible evidence that the plaintiff, at the time he exercised his option in 1936, thought that he was entering into so unconscionable a bargain with the insurance company, that any respresentations to that effect were made to him, or that he would not have exercised the option but for such representations.

■ In the years which elapsed, the plaintiff has parted with and lost nothing. It is true that the insurance company has had the use of a certain portion of the monies which, through the years, he had paid in and which could have been withdrawn by him, if he chose to terminate the policy. But in consideration of such "hiring" of the money, to use an expression made famous by President Calvin Coolidge, the insurance was continued during this period and he exercised his full borrowing rights under the policy. So, if plaintiff's present demands were allowed, he would receive something which he did not bargain or pay for,— something for nothing. The language of the Persian poet applies:

"Sue for a Debt he never did contract,
And cannot answer—
Oh, the sorry trade."[29]

It would be neither good morals nor good law to sanction the application of such a policy to business relations.

On the other hand, a ruling for the defendant avoids a palpable injustice and still allows the plaintiff the full benefit of the contract *he and the company intended* to make.

Judgment will, therefore, be for the defendant.

26. Luftig v. Travelers Ins. Co., 1938, 253 App.Div. 538, 2 N.Y.S.2d 904, 908; Pearce v. Knepper, Sup.1945, 53 N.Y.S. 2d 845, 846, and cases there cited.

27. Woodbine v. Van Horn, 1946, 29 Cal. 2d 95, 104, 173 P.2d 17, 22.

28. Woodbine v. Van Horn, supra, Note 27, 29 Cal.2d at page 104, 173 P.2d at page 22. This accords with the general law: see, Pacific Portland Cement Co. v. Food Mach. & Chem. Corp., 9 Cir., 1949, 178 F.2d 541, 552, 554; Restatement, Contracts, § 235(e); 17 C.J.S., Contracts, § 325. As to all matters relating to the substantive law of contracts, the law of New York applies. Federal law applies as to pleading, procedure and the remedies sought. The only California law which applies is the statute of limitations, and even as to it, *the manner of pleading it or avoiding it when it is pleaded*, is governed by federal rules. However, in this and other notes, such as 15, 24, 25 and 27, we have given California references in order to show that the rules of construction applied in this opinion find support in the California State law.

29. Omar Khayyám, The Rubáiyát, Edward · FitzGerald Tr., 4th Ed. 79th Quatrain.